# SUPREME COURT OF THE UNITED STATES

CHADRIN LEE MULLENIX *v.* BEATRICE LUNA,
INDIVIDUALLY AND AS REPRESENTATIVE OF THE
ESTATE OF ISRAEL LEIJA, JR., ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 14–1143.    Decided November 9, 2015

PER CURIAM.

On the night of March 23, 2010, Sergeant Randy Baker of the Tulia, Texas Police Department followed Israel Leija, Jr., to a drive-in restaurant, with a warrant for his arrest. 773 F. 3d 712, 715–716 (CA5 2014). When Baker approached Leija's car and informed him that he was under arrest, Leija sped off, headed for Interstate 27. 2013 WL 4017124, *1 (ND Tex., Aug. 7, 2013). Baker gave chase and was quickly joined by Trooper Gabriel Rodriguez of the Texas Department of Public Safety (DPS). 773 F. 3d, at 716.

Leija entered the interstate and led the officers on an 18-minute chase at speeds between 85 and 110 miles per hour. *Ibid.* Twice during the chase, Leija called the Tulia Police dispatcher, claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit. The dispatcher relayed Leija's threats, together with a report that Leija might be intoxicated, to all concerned officers.

As Baker and Rodriguez maintained their pursuit, other law enforcement officers set up tire spikes at three locations. Officer Troy Ducheneaux of the Canyon Police Department manned the spike strip at the first location Leija was expected to reach, beneath the overpass at Cemetery Road. Ducheneaux and the other officers had received training on the deployment of spike strips, including on how to take a defensive position so as to minimize

the risk posed by the passing driver. *Ibid.*

DPS Trooper Chadrin Mullenix also responded. He drove to the Cemetery Road overpass, initially intending to set up a spike strip there. Upon learning of the other spike strip positions, however, Mullenix began to consider another tactic: shooting at Leija's car in order to disable it. 2013 WL 4017124, *1. Mullenix had not received training in this tactic and had not attempted it before, but he radioed the idea to Rodriguez. Rodriguez responded "10–4," gave Mullenix his position, and said that Leija had slowed to 85 miles per hour. Mullenix then asked the DPS dispatcher to inform his supervisor, Sergeant Byrd, of his plan and ask if Byrd thought it was "worth doing." 773 F. 3d, at 716–717. Before receiving Byrd's response, Mullenix exited his vehicle and, armed with his service rifle, took a shooting position on the overpass, 20 feet above I–27. Respondents allege that from this position, Mullenix still could hear Byrd's response to "stand by" and "see if the spikes work first." *Ibid.**

As Mullenix waited for Leija to arrive, he and another officer, Randall County Sheriff's Deputy Tom Shipman, discussed whether Mullenix's plan would work and how and where to shoot the vehicle to best carry it out. 2013 WL 4017124, *2. Shipman also informed Mullenix that another officer was located beneath the overpass. 773 F. 3d, at 717.

Approximately three minutes after Mullenix took up his shooting position, he spotted Leija's vehicle, with Rodriguez in pursuit. As Leija approached the overpass, Mullenix fired six shots. Leija's car continued forward beneath the overpass, where it engaged the spike strip, hit

---

*Although Mullenix disputes hearing Byrd's response, we view the facts in the light most favorable to respondents, who oppose Mullenix's motion for summary judgment. See *Tolan* v. *Cotton*, 572 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 1).

the median, and rolled two and a half times. It was later determined that Leija had been killed by Mullenix's shots, four of which struck his upper body. There was no evidence that any of Mullenix's shots hit the car's radiator, hood, or engine block. *Id.*, at 716–717; 2013 WL 4017124, *2–*3.

Respondents sued Mullenix under Rev. Stat. §1979, 42 U. S. C. §1983, alleging that he had violated the Fourth Amendment by using excessive force against Leija. Mullenix moved for summary judgment on the ground of qualified immunity, but the District Court denied his motion, finding that "[t]here are genuine issues of fact as to whether Trooper Mullenix acted recklessly, or acted as a reasonable, trained peace officer would have acted in the same or similar circumstances." 2013 WL 4017124, *6.

Mullenix appealed, and the Court of Appeals for the Fifth Circuit affirmed. 765 F. 3d 531 (2014). The court agreed with the District Court that the "immediacy of the risk posed by Leija is a disputed fact that a reasonable jury could find either in the plaintiffs' favor or in the officer's favor, precluding us from concluding that Mullenix acted objectively reasonably as a matter of law." *Id.*, at 538.

Judge King dissented. She described the "'fact issue' referenced by the majority" as "simply a restatement of the objective reasonableness test that applies to Fourth Amendment excessive force claims," which, she noted, the Supreme Court has held "'is a pure question of law.'" *Id.*, at 544–545 (quoting *Scott* v. *Harris*, 550 U. S. 372, 381, n. 8 (2007)). Turning to that legal question, Judge King concluded that Mullenix's actions were objectively reasonable. When Mullenix fired, she emphasized, he knew not only that Leija had threatened to shoot the officers involved in his pursuit, but also that Leija was seconds away from encountering such an officer beneath the overpass. Judge King also dismissed the notion that Mullenix should

have given the spike strips a chance to work. She explained that because spike strips are often ineffective, and because officers operating them are vulnerable to gunfire from passing cars, Mullenix reasonably feared that the officers manning them faced a significant risk of harm. 765 F. 3d, at 548–549.

Mullenix sought rehearing en banc before the Fifth Circuit, but the court denied his petition. Judge Jolly dissented, joined by six other members of the court. Judge King, who joined Judge Jolly's dissent, also filed a separate dissent of her own. 777 F. 3d 221 (2014) (*per curiam*). On the same day, however, the two members forming the original panel's majority withdrew their previous opinion and substituted a new one. 773 F. 3d 712. The revised opinion recognized that objective unreasonableness is a question of law that can be resolved on summary judgment—as Judge King had explained in her dissent—but reaffirmed the denial of qualified immunity. *Id.*, at 715, 718. The majority concluded that Mullenix's actions were objectively unreasonable because several of the factors that had justified deadly force in previous cases were absent here: There were no innocent bystanders, Leija's driving was relatively controlled, Mullenix had not first given the spike strips a chance to work, and Mullenix's decision was not a split-second judgment. *Id.*, at 720–724. The court went on to conclude that Mullenix was not entitled to qualified immunity because "the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a sufficiently substantial and immediate threat, violated the Fourth Amendment." *Id.*, at 725.

We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place, and now reverse.

The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 555 U. S. 223, 231 (2009) (quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle* v. *Howards*, 566 U. S. ___, ___ (2012) (slip op., at 5) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 741 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986).

"We have repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, *supra*, at 742. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau* v. *Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*) (quoting *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001)). Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." 533 U. S., at 205.

In this case, the Fifth Circuit held that Mullenix violated the clearly established rule that a police officer may not "'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.'" 773 F. 3d, at 725. Yet this Court has previously considered— and rejected—almost that exact formulation of the qualified immunity question in the Fourth Amendment context.

In *Brosseau*, which also involved the shooting of a suspect fleeing by car, the Ninth Circuit denied qualified immunity on the ground that the officer had violated the clearly established rule, set forth in *Tennessee* v. *Garner*, 471 U. S. 1 (1985), that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Haugen* v. *Brosseau*, 339 F. 3d 857, 873 (CA9 2003) (internal quotation marks omitted). This Court summarily reversed, holding that use of *Garner*'s "general" test for excessive force was "mistaken." *Brosseau*, 543 U. S., at 199. The correct inquiry, the Court explained, was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the "'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.*, at 199–200. The Court considered three court of appeals cases discussed by the parties, noted that "this area is one in which the result depends very much on the facts of each case," and concluded that the officer was entitled to qualified immunity because "[n]one of [the cases] *squarely governs* the case here." *Id.,* at 201 (emphasis added).

   *Anderson* v. *Creighton*, 483 U. S. 635 (1987), is also instructive on the required degree of specificity. There, the lower court had denied qualified immunity based on the clearly established "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." *Id.*, at 640. This Court faulted that formulation for failing to address the actual question at issue: whether "the circumstances with which Anderson was confronted . . . constitute[d] probable cause and exigent circumstances." *Id.*, at 640–641. Without answering that question, the Court explained, the conclusion that Anderson's search was

objectively unreasonable did not "follow immediately" from—and thus was not clearly established by—the principle that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment. *Id.*, at 641.

In this case, Mullenix confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road. The relevant inquiry is whether existing precedent placed the conclusion that Mullenix acted unreasonably in these circumstances "beyond debate." *al-Kidd*, *supra,* at 741. The general principle that deadly force requires a sufficient threat hardly settles this matter. See *Pasco* v. *Knoblauch*, 566 F. 3d 572, 580 (CA5 2009) ("[I]t would be unreasonable to expect a police officer to make the numerous legal conclusions necessary to apply *Garner* to a high-speed car chase . . .").

Far from clarifying the issue, excessive force cases involving car chases reveal the hazy legal backdrop against which Mullenix acted. In *Brosseau* itself, the Court held that an officer did not violate clearly established law when she shot a fleeing suspect out of fear that he endangered "other officers on foot who [she] *believed* were in the immediate area," "the occupied vehicles in [his] path," and "any other citizens who *might* be in the area." 543 U. S., at 197 (first alteration in original; internal quotation marks omitted; emphasis added). The threat Leija posed was at least as immediate as that presented by a suspect who had just begun to drive off and was headed only in the general direction of officers and bystanders. *Id.*, at 196– 197. By the time Mullenix fired, Leija had led police on a 25-mile chase at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards an officer's location.

Per Curiam

This Court has considered excessive force claims in connection with high-speed chases on only two occasions since *Brosseau*. In *Scott* v. *Harris*, 550 U. S. 372, the Court held that an officer did not violate the Fourth Amendment by ramming the car of a fugitive whose reckless driving "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.,* at 384. And in *Plumhoff* v. *Rickard*, 572 U. S. ___ (2014), the Court reaffirmed *Scott* by holding that an officer acted reasonably when he fatally shot a fugitive who was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road." 572 U. S., at ___ (slip op., at 10). The Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity. Leija in his flight did not pass as many cars as the drivers in *Scott* or *Plumhoff*; traffic was light on I–27. At the same time, the fleeing fugitives in *Scott* and *Plumhoff* had not verbally threatened to kill any officers in their path, nor were they about to come upon such officers. In any event, none of our precedents "squarely governs" the facts here. Given Leija's conduct, we cannot say that only someone "plainly incompetent" or who "knowingly violate[s] the law" would have perceived a sufficient threat and acted as Mullenix did. *Malley*, 475 U. S., at 341.

The dissent focuses on the availability of spike strips as an alternative means of terminating the chase. It argues that even if Leija posed a threat sufficient to justify deadly force in some circumstances, Mullenix nevertheless contravened clearly established law because he did not wait to see if the spike strips would work before taking action. Spike strips, however, present dangers of their own, not only to drivers who encounter them at speeds between 85 and 110 miles per hour, but also to officers manning them.

See, *e.g., Thompson* v. *Mercer*, 762 F. 3d 433, 440 (CA5 2014); Brief for National Association of Police Organizations et al. as *Amici Curiae* 15–16.  Nor are spike strips always successful in ending the chase.  See, *e.g., Cordova* v. *Aragon*, 569 F. 3d 1183, 1186 (CA10 2009); Brief for National Association of Police Organizations et al. as *Amici Curiae* 16 (citing examples).  The dissent can cite no case from this Court denying qualified immunity because officers entitled to terminate a high-speed chase selected one dangerous alternative over another.

Even so, the dissent argues, there was no governmental interest that justified acting before Leija's car hit the spikes.  Mullenix explained, however, that he feared Leija might attempt to shoot at or run over the officers manning the spike strips.  Mullenix also feared that even if Leija hit the spike strips, he might still be able to continue driving in the direction of other officers.  The dissent ignores these interests by suggesting that there was no "possible marginal gain in shooting at the car over using the spike strips already in place." *Post*, at 4 (opinion of SOTOMAYOR, J.).  In fact, Mullenix hoped his actions would stop the car in a manner that avoided the risks to other officers and other drivers that relying on spike strips would entail.  The dissent disputes the merits of the options available to Mullenix, *post*, at 3–4, but others with more experience analyze the issues differently.  See, *e.g.,* Brief for National Association of Police Organizations et al. as *Amici Curiae* 15–16. Ultimately, whatever can be said of the wisdom of Mullenix's choice, this Court's precedents do not place the conclusion that he acted unreasonably in these circumstances "beyond debate." *al-Kidd*, 563 U. S., at 741.

More fundamentally, the dissent repeats the Fifth Circuit's error.  It defines the qualified immunity inquiry at a high level of generality—whether any governmental interest justified choosing one tactic over another—and then fails to consider that question in "the specific context of

the case." *Brosseau* v. *Haugen*, 543 U. S., at 198 (internal quotation marks omitted). As in *Anderson*, the conclusion that Mullenix's reasons were insufficient to justify his actions simply does not "follow immediately" from the general proposition that force must be justified. 483 U. S., at 641.

Cases decided by the lower courts since *Brosseau* likewise have not clearly established that deadly force is inappropriate in response to conduct like Leija's. The Fifth Circuit here principally relied on its own decision in *Lytle* v. *Bexar County*, 560 F. 3d 404 (2009), denying qualified immunity to a police officer who had fired at a fleeing car and killed one of its passengers. That holding turned on the court's assumption, for purposes of summary judgment, that the car was moving away from the officer and had already traveled some distance at the moment the officer fired. See *id.*, at 409. The court held that a reasonable jury could conclude that a receding car "did not pose a sufficient threat of harm such that the use of deadly force was reasonable." *Id.*, at 416. But, crucially, the court also recognized that if the facts were as the officer alleged, and he fired as the car was coming towards him, "he would likely be entitled to qualified immunity" based on the "threat of immediate and severe physical harm." *Id.*, at 412. Without implying that *Lytle* was either correct or incorrect, it suffices to say that *Lytle* does not clearly dictate the conclusion that Mullenix was unjustified in perceiving grave danger and responding accordingly, given that Leija was speeding towards a confrontation with officers he had threatened to kill.

Cases that the Fifth Circuit ignored also suggest that Mullenix's assessment of the threat Leija posed was reasonable. In *Long* v. *Slaton*, 508 F. 3d 576 (2007), for example, the Eleventh Circuit held that a sheriff's deputy did not violate the Fourth Amendment by fatally shooting a mentally unstable individual who was attempting to flee

in the deputy's car, even though at the time of the shooting the individual had not yet operated the cruiser dangerously. The court explained that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect" and concluded that the deputy had reason to believe Long was dangerous based on his unstable state of mind, theft of the cruiser, and failure to heed the deputy's warning to stop. *Id.*, at 581–582. The court also rejected the notion that the deputy should have first tried less lethal methods, such as spike strips. "[C]onsidering the unpredictability of Long's behavior and his fleeing in a marked police cruiser," the court held, "we think the police need not have taken that chance and hoped for the best." *Id.*, at 583 (alteration and internal quotation marks omitted). But see *Smith* v. *Cupp*, 430 F. 3d 766, 774–777 (CA6 2005) (denying qualified immunity to an officer who shot an intoxicated suspect who had stolen the officer's cruiser where a reasonable jury could have concluded that the suspect's flight did not immediately threaten the officer or any other bystander).

Other cases cited by the Fifth Circuit and respondents are simply too factually distinct to speak clearly to the specific circumstances here. Several involve suspects who may have done little more than flee at relatively low speeds. See, *e.g.*, *Walker* v. *Davis*, 649 F. 3d 502, 503 (CA6 2011); *Kirby* v. *Duva*, 530 F. 3d 475, 479–480 (CA6 2008); *Adams* v. *Speers*, 473 F. 3d 989, 991 (CA9 2007); *Vaughan* v. *Cox*, 343 F. 3d 1323, 1330–1331, and n. 7 (CA11 2003). These cases shed little light on whether the far greater danger of a speeding fugitive threatening to kill police officers waiting in his path could warrant deadly force. The court below noted that "no weapon was ever seen," 773 F. 3d, at 723, but surely in these circumstances the police were justified in taking Leija at his word when he twice told the dispatcher he had a gun and was prepared

to use it.

Finally, respondents argue that the danger Leija represented was less substantial than the threats that courts have found sufficient to justify deadly force. But the mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here. The fact is that when Mullenix fired, he reasonably understood Leija to be a fugitive fleeing arrest, at speeds over 100 miles per hour, who was armed and possibly intoxicated, who had threatened to kill any officer he saw if the police did not abandon their pursuit, and who was racing towards Officer Ducheneaux's position. Even accepting that these circumstances fall somewhere between the two sets of cases respondents discuss, qualified immunity protects actions in the "'hazy border between excessive and acceptable force.'" *Brosseau*, *supra*, at 201 (quoting *Saucier*, 533 U. S., at 206; some internal quotation marks omitted).

Because the constitutional rule applied by the Fifth Circuit was not "'beyond debate,'" *Stanton* v. *Sims*, 571 U. S. ___, ___ (2013) (*per curiam*) (slip op., at 8), we grant Mullenix's petition for certiorari and reverse the Fifth Circuit's determination that Mullenix is not entitled to qualified immunity.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

## CHADRIN LEE MULLENIX *v.* BEATRICE LUNA,
### INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ISRAEL LEIJA, JR., ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 14–1143. Decided November 9, 2015

JUSTICE SCALIA, concurring in the judgment.

I join the judgment of the Court, but would not describe what occurred here as the application of deadly force in effecting an arrest. Our prior cases have reserved that description to the directing of force sufficient to kill *at the person* of the desired arrestee. See, *e.g.*, *Plumhoff* v. *Rickard*, 572 U. S. \_\_\_ (2014); *Brosseau* v. *Haugen*, 543 U. S. 194 (2004) (*per curiam*); *Tennessee* v. *Garner*, 471 U. S. 1 (1985). It does not assist analysis to refer to all use of force that happens to kill the arrestee as the application of deadly force. The police might, for example, attempt to stop a fleeing felon's car by felling a large tree across the road; if they drop the tree too late, so that it crushes the car and its occupant, I would not call that the application of deadly force. Though it was force sufficient to kill, it was not applied with the object of harming the body of the felon.

Thus, in *Scott* v. *Harris*, 550 U. S. 372 (2007), we declined to characterize officer Scott's use of his pursuing vehicle's bumper to push the fleeing vehicle off the road as the application of deadly force. Whether or not it was that, we said, "all that matters is whether Scott's actions were reasonable." *Id.*, at 383. So also here. But it stacks the deck against the officer, it seems to me, to describe his action as the application of deadly force.

It was at least arguable in *Scott* that pushing a speeding vehicle off the road is targeting its occupant for injury or

death.   Here, however, it is conceded that Trooper Mullenix did not shoot to wound or kill the fleeing Leija, nor even to drive Leija's car off the road, but only to cause the car to stop by destroying its engine.   That was a risky enterprise, as the outcome demonstrated; but determining whether it violated the Fourth Amendment requires us to ask, not whether it was reasonable to kill Leija, but whether it was reasonable to shoot at the engine in light of the risk to Leija.   It distorts that inquiry, I think, to make the question whether it was reasonable for Mullenix to "apply deadly force."

# SUPREME COURT OF THE UNITED STATES

CHADRIN LEE MULLENIX *v.* BEATRICE LUNA,
INDIVIDUALLY AND AS REPRESENTATIVE OF THE
ESTATE OF ISRAEL LEIJA, JR., ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 14–1143.   Decided November 9, 2015

JUSTICE SOTOMAYOR, dissenting.

Chadrin Mullenix fired six rounds in the dark at a car traveling 85 miles per hour. He did so without any training in that tactic, against the wait order of his superior officer, and less than a second before the car hit spike strips deployed to stop it. Mullenix's rogue conduct killed the driver, Israel Leija, Jr. Because it was clearly established under the Fourth Amendment that an officer in Mullenix's position should not have fired the shots, I respectfully dissent from the grant of summary reversal.

I

Resolving all factual disputes in favor of plaintiffs, as the Court must on a motion for summary judgment, Mullenix knew the following facts before he shot at Leija's engine block: Leija had led police officers on an 18-minute car chase, at speeds ranging from 85 to 110 miles per hour. 773 F. 3d 712, 716 (CA5 2014). Leija had twice called the police dispatcher threatening to shoot at officers if they did not cease the pursuit. *Ibid.* Police officers were deploying three sets of spike strips in order to stop Leija's flight. *Ibid.* The officers were trained to stop a car using spike strips. This training included how to take a defensive position to minimize the risk of danger from the target car. *Ibid.* Mullenix knew that spike strips were being set up directly beneath the overpass where he was stationed. *Id.,* at 723. There is no evidence below that any of

the officers with whom Mullenix was in communication—including Officer Troy Ducheneaux, whom Mullenix believed to be below the overpass—had expressed any concern for their safety. *Id.,* at 720.

Mullenix had no training in shooting to disable a moving vehicle and had never seen the tactic done before. *Id.*, at 716. He also lacked permission to take the shots: When Mullenix relayed his plan to his superior officer, Robert Byrd, Byrd responded "stand by" and "see if the spikes work first." *Id.*, at 716–717. Three minutes after arriving at the overpass, Mullenix fired six rounds at Leija's car. None hit the car's engine block; at least four struck Leija in the upper body, killing Leija. *Id.,* at 717.

## II

When confronting a claim of qualified immunity, a court asks two questions. First, the court considers whether the officer in fact violated a constitutional right. *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). Second, the court asks whether the contours of the right were "sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right." *Id.,* at 202 (quoting *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987)). This Court has rejected the idea that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.*, at 640. Instead, the crux of the qualified immunity test is whether officers have "fair notice" that they are acting unconstitutionally. *Hope* v. *Pelzer*, 536 U. S. 730, 739 (2002).

Respondents here allege that Mullenix violated the Fourth Amendment's prohibition on unreasonable seizures by using deadly force to apprehend Leija. This Court's precedents clearly establish that the Fourth Amendment is violated unless the "'governmental interests'" in effectuating a particular kind of seizure outweigh the "'nature and quality of the intrusion on the individual's Fourth

Amendment interests.'"  *Scott* v. *Harris*, 550 U. S. 372, 383 (2007) (quoting *United States* v. *Place*, 462 U. S. 696, 703 (1983)).  There must be a "governmental interes[t]" not only in effectuating a seizure, but also in "how [the seizure] is carried out."  *Tennessee* v. *Garner*, 471 U. S. 1, 8 (1985).

Balancing a particular governmental interest in the use of deadly force against the intrusion occasioned by the use of that force is inherently a fact-specific inquiry, not susceptible to bright lines.  But it is clearly established that the government must have *some* interest in using deadly force over other kinds of force.

Here, then, the clearly established legal question—the question a reasonable officer would have asked—is whether, under all the circumstances as known to Mullenix, there was a governmental interest in shooting at the car rather than waiting for it to run over spike strips.

The majority does not point to *any* such interest here.  It claims that Mullenix's goal was not merely to stop the car, but to stop the car "in a manner that avoided the risks" of relying on spike strips.  *Ante,* at 9.  But there is no evidence in the record that shooting at Leija's engine block would stop the car in such a manner.

The majority first suggests that Mullenix did not wait for the results of the spikes, as his superior advised, because of his concern for the officers manning the strips.  But Leija was going to come upon those officers whether or not Mullenix's shooting tactic was successful: Mullenix took his shot when Leija was between 25 and 30 yards away from the spike strip, traveling at 85 miles per hour.  Even if his shots hit Leija's engine block, the car would not have stopped instantly.  Mullenix would have bought the officers he was trying to protect—officers who had been trained to take defensive positions—less than three-quarters of a second over waiting for the spike strips.  And whatever threat Leija posed after his car was stopped

existed whether the car was stopped by a shot to the engine block or by the spike strips.

Nor was there any evidence that shooting at the car was more reliable than the spike strips. The majority notes that spike strips are fallible. *Ante*, at 8–9. But Mullenix had no information to suggest that shooting to disable a car had a higher success rate, much less that doing so with no training and at night was more likely to succeed. Moreover, not only did officers have training in setting up the spike strips, but they had also placed two backup strips further north along the highway in case the first set failed. A reasonable officer could not have thought that shooting would stop the car with less danger or greater certainty than waiting.

The majority cites *Long* v. *Slaton*, 508 F. 3d 576 (CA11 2007), for the proposition that Mullenix need not have "first tried less lethal methods, such as spike strips." *Ante,* at 11. But in that case, there was a clear reason to prefer deadly force over the alternatives. In *Long*, an officer fired to stop a suspect from fleeing in a stolen police cruiser. 508 F. 3d, at 583. When the officer fired, there were no alternative means of stopping the car in place. The Eleventh Circuit held that the governmental interest against waiting for a future deployment of spike strips that may never materialize justified the use of deadly force. *Ibid.*

In this case, by contrast, neither petitioner nor the majority can point to any possible marginal gain in shooting at the car over using the spike strips already in place. It is clearly established that there must be some governmental interest that necessitates deadly force, even if it is not always clearly established what level of governmental interest is sufficient.

Under the circumstances known to him at the time, Mullenix puts forth no plausible reason to choose shooting at Leija's engine block over waiting for the results of the

spike strips. I would thus hold that Mullenix violated Leija's clearly established right to be free of intrusion absent some governmental interest.

## III

The majority largely evades this key legal question by focusing primarily on the governmental interest in *whether* the car should be stopped rather than the dispositive question of *how* the car should be stopped. But even assuming that Leija posed a "sufficient," *ante*, at 8, or "immediate," *ante*, at 7, threat, Mullenix did not face a "choice between two evils" of shooting at a suspect's car or letting him go. *Scott*, 550 U. S., at 384; see, *e.g., Plumhoff* v. *Rickard*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 3, 10); *Brosseau* v. *Haugen*, 543 U. S. 194, 196–197 (2004). Instead, Mullenix chose to employ a potentially lethal tactic (shooting at Leija's engine block) in addition to a tactic specifically designed to accomplish the same result (spike strips).\*  By granting Mullenix qualified immunity, this Court goes a step further than our previous cases and does so without full briefing or argument.

Thus framed, it is apparent that the majority's exhortation that the right at stake not be defined at "a high level of generality," see *ante,* at 9, is a red herring. The majority adduces various facts that the Fifth Circuit supposedly ignored in its qualified immunity analysis, including that

---

\*The majority describes the choice between spike strips and shooting as the choice between "one dangerous alternative" and another, noting that spike strips can pose a danger to drivers that encounter them. *Ante,* at 8–9. But Mullenix could not have thought that awaiting the spikes was anywhere near as dangerous as shooting immediately before Leija hit the spikes. For one thing, Mullenix had no training in shooting to disable the vehicle and so no idea of the relative danger that shooting posed to a driver. For another, Leija would be subjected to the danger posed by the spike strips whether Mullenix shot or not. And, in fact, that is what happened: Leija's car hit the spike strips and then rolled two and a half times.

Leija was "a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road." *Ante,* at 7.  But not one of those facts goes to the governmental interest in shooting over awaiting the spike strips.  The majority also claims that established law does not make clear that "Mullenix's reasons were insufficient to justify" his choice of shooting over following his superior's orders to wait for the spikes.  *Ante*, at 9–10.  But Mullenix seemed to have *no* reasons to prefer shooting to following orders.

Instead of dealing with the question whether Mullenix could constitutionally fire on Leija's car rather than waiting for the spike strips, the majority dwells on the imminence of the threat posed by Leija.  The majority recharacterizes Mullenix's decision to shoot at Leija's engine block as a split-second, heat-of-the-moment choice, made when the suspect was "moments away."  *Ante,* at 7.  Indeed, reading the majority opinion, one would scarcely believe that Mullenix arrived at the overpass several minutes before he took his shot, or that the rural road where the car chase occurred had few cars and no bystanders or businesses.  773 F. 3d, at 717, 720.  The majority also glosses over the facts that Mullenix had time to ask Byrd for permission to fire upon Leija and that Byrd—Mullenix's superior officer—told Mullenix to "stand by." *Id.*, at 717.  There was no reason to believe that Byrd did not have all the same information Mullenix did, including the knowledge that an officer was stationed beneath the overpass.  Even after receiving Byrd's response, Mullenix spent minutes in shooting position discussing his next step with a fellow officer, minutes during which he received no information that would have made his plan more suitable or his superior's orders less so.  *Ibid.*

An appropriate reading of the record on summary judg-

ment would thus render Mullenix's choice even more unreasonable. And asking the appropriate legal question would leave the majority with no choice but to conclude that Mullenix ignored the longstanding and well-settled Fourth Amendment rule that there must be a governmental interest not just in seizing a suspect, but in the level of force used to effectuate that seizure.

*      *      *

When Mullenix confronted his superior officer after the shooting, his first words were, "How's that for proactive?" *Ibid.* (Mullenix was apparently referencing an earlier counseling session in which Byrd suggested that he was not enterprising enough. *Ibid.*) The glib comment does not impact our legal analysis; an officer's actual intentions are irrelevant to the Fourth Amendment's "objectively reasonable" inquiry. See *Graham* v. *Connor*, 490 U. S. 386, 397 (1989). But the comment seems to me revealing of the culture this Court's decision supports when it calls it reasonable—or even reasonably reasonable—to use deadly force for no discernible gain and over a supervisor's express order to "stand by." By sanctioning a "shoot first, think later" approach to policing, the Court renders the protections of the Fourth Amendment hollow.

For the reasons discussed, I would deny Mullenix's petition for a writ of certiorari. I thus respectfully dissent.