NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0136n.06
No. 17-3305

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Mar 15, 2018

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| WILLIAM STANFIELD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| CITY OF LIMA, et al., | ) | DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**BEFORE: KEITH, KETHLEDGE and DONALD, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** During an interaction with three officers from the Lima Police Department, Plaintiff-Appellant William Stanfield ("Stanfield") was tripped and taken to the ground by one officer, kneed repeatedly in the ribs by another officer, and struck twice in the legs with a long flashlight by a third officer. Based on these three uses of force, Stanfield brought suit against the three officers, the chief of police, and the City of Lima, Ohio ("Defendants-Appellees"). Stanfield sued the three officers for excessive use of force, in violation of 42 U.S.C. § 1983, *inter alia*. Stanfield sued the City and its police chief for deficient hiring and supervision of the three officers, alleging a custom or policy of deliberate indifference to officers who violated the constitutional rights of others.

Defendants-Appellees moved for summary judgment, arguing that the three officers are entitled to qualified immunity, and therefore, neither the city nor its police chief can be held liable for their actions. The district court granted Defendants-Appellees' motion for summary judgment. Stanfield appealed. For the reasons set forth below, we **AFFIRM**.

## I. FACTS

On the evening of October 4, 2013, Lima police officers received a report that a white RV was driving erratically in their area. They located and began following a white RV, which was being driven by Stanfield. The officers followed, but did not attempt to stop, Stanfield's vehicle. Stanfield eventually pulled into an empty lot he owned, into which the officers followed. A dashcam in one of the police vehicles recorded video of the events that ensued thereafter. The body microphones worn by two of the officers recorded the accompanying audio.

### A. Facts from the Video and Audio Recordings

Officer Bryce Garman ("Garman") approached the passenger side of the RV and began speaking with Stanfield. A few seconds later, Stanfield exited the RV as Officers Aaron Rode ("Rode") and Aaron Montgomery ("Montgomery") made their way toward the passenger side of the RV. One of the officers asked Stanfield to keep his hands out of his pockets and inquired whether he had anything on his person. Stanfield replied, "No." The officers then asked whether Stanfield had been drinking, to which Stanfield replied, "What makes the difference?"

A few seconds later, Stanfield put his right hand in his pocket. This prompted Garman to step forward and attempt to grab Stanfield's right wrist. Stanfield quickly pulled his right hand out of his pocket and moved it away from Garman. Montgomery stepped behind Stanfield. One of the officers reminded Stanfield to keep his hands out of his pockets. Stanfield then turned his body to the right, held up both hands, and said, "Now listen, I'm not gonna . . . ." As Stanfield began to speak, Garman stepped behind him and said, "I'm gonna pat you down real quick. Alright man."

Garman took hold of Stanfield's left wrist and placed his left arm on top of his head. As Stanfield raised his right arm toward his head to match the position of his left arm,

Montgomery took hold of Stanfield's right wrist, brought his arm down, and started to put it behind Stanfield's back. Seeing this, Garman moved Stanfield's left arm behind his back as well. During this process, Stanfield turned his body to the left and lifted his right leg. Stanfield then leaned forward, attempted to raise his right arm, and twisted his body to the left. Montgomery reacted to this movement by forcefully shoving Stanfield from the rear while simultaneously putting his leg in front of Stanfield's legs to make him fall, performing a "takedown" of Stanfield.

Stanfield landed on his back, and Garman and Montgomery wrestled with him until they succeeded in turning him over so he was lying on his stomach. Montgomery knelt on Stanfield's back. The officers continued to wrestle with Stanfield while repeatedly telling him to remove his hands from under him and put them behind his back. Stanfield replied, "I can't. Quit (kneeing or beating) me." While Stanfield was on the ground, Rode struck him twice on the leg with his flashlight.

**B. Undisputed Facts**

Stanfield was intoxicated on the evening of the altercation. Stanfield was arrested for operating a vehicle under the influence of alcohol and resisting arrest. While Stanfield was on the ground, Garman kneed him in the ribs at least twice. When he was taken to the hospital, medical staff noted that Stanfield had swelling and redness on his eye and face, and that one of his ribs was fractured.

**C. Disputed Facts**

The officers argue that, when they had Stanfield's arms behind his back, his movements (i.e., leaning forward, attempting to raise his right arm, and twisting his body to the left) constituted active resistance. Stanfield argues that he, being intoxicated, lost his balance while

the officers were putting his hands behind his back, which resulted in the movements the officers perceived as resistance.

## II.  STANDARD OF REVIEW

Courts should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he inferences to be drawn from the underlying facts contained in [the record] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, when a recording of the event exists, courts should not adopt any of the plaintiff's alleged facts that are blatantly contradicted by the recording.  *Id*. at 380.

This court applies de novo review to a district court's grant of summary judgment, "using the same standards applied by the district court."  *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999).  "Under de novo review, we draw our own inferences and legal conclusions from the record."  *Id*.

## III.  DISCUSSION

Stanfield claims that the three officers violated his Fourth Amendment right to be free from the use of excessive force in his arrest.  The three officers argue that they are entitled to summary judgment because the facts here, even construed in the light most favorable to Stanfield, entitle them to qualified immunity from suit.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

When resolving government officials' qualified immunity claims, courts conduct a two-pronged inquiry, asking: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citations omitted). These two prongs, which a court can address in whichever order it deems appropriate, must both be answered in the affirmative in order for a plaintiff to defeat a defendant's claim of qualified immunity. *Id*. at 236. Each prong of the qualified immunity inquiry is analyzed in turn below.

**A.  Whether the Three Officers Violated Stanfield's Constitutional Rights**

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. at 396. "But the question is . . . whether [officers] could reasonably use the *degree* of force employed against [the suspect]." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (emphasis in the original).

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

*Graham*, 490 U.S. at 397. Because this is a summary judgment motion, we determine the facts and circumstances at issue by first construing the alleged facts in the light most favorable to the non-moving party (here, Stanfield). Because this is a qualified immunity case, we then view the non-moving party's facts "from the perspective of a reasonable officer on the scene" to determine if the use of force at issue was reasonable on those facts. *Id*. at 396.

The reasonableness standard "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Among the factors to be considered and balanced by the court are: "[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. After balancing these factors, "the question is whether the totality of the circumstances justified a particular sort of seizure." *Id*. (quoting *Garner*, 471 U.S. at 8-9) (internal quotation marks omitted).

1. Severity of the Crime

The three officers followed Stanfield's RV and confronted him because they suspected that he was driving under the influence of alcohol, and they ultimately arrested him for that crime. This court has described driving under the influence as "moderate in severity." *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004); *see also Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) (holding that operating a car while intoxicated is "not a severe offense").

2. Immediate Threat Posed by Stanfield

The three officers offer a handful of reasons to explain why they perceived Stanfield as a threat and therefore needed "to pat him down for weapons." Among these reasons, the only ones confirmed by the recordings or agreed to by Stanfield are: (1) he put his hand into his pocket after being told not to do so; (2) he was intoxicated; and (3) he had an argumentative demeanor. Each reason is explored individually below.

Soon after Stanfield exited the RV, the officers told him to keep his hands out of his pockets. Only 10-15 seconds later, Stanfield put his right hand in his pocket. When Garman reached for Stanfield's right wrist, Stanfield quickly pulled his right hand out of his pocket, turned his body away from Garman, held up both hands, and said, "Now listen, I'm not gonna . . . ." It was at this point that Garman stated he was going to perform a pat down. Viewing this activity "from the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396, it would have been reasonable for the officers to perceive that Stanfield was possibly carrying a weapon. However, a reasonable officer on the scene should have also considered the fact that Stanfield raised his hands, and the absence of more indicia that he was carrying weapons (e.g., no bulge in his pocket, etc.), when assessing his threat level.

The second reason cited by the officers, Stanfield's intoxicated state, may have reasonably caused the officers to perceive Stanfield as a higher-than-normal threat because, as we have noted, "heavy intoxication [can] create[] a volatile situation." *Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007). However, "while heavy intoxication may, on its own, render it reasonable to handcuff an individual, the reasonableness of the force used to effectuate the seizure . . . will generally depend upon other circumstances, such as the individual's *resistance* and *hostility*." *Solovy v. Morabito*, 375 F. App'x 521, 525 n.4 (6th Cir. 2010) (citing *Marvin*,

509 F.3d 234) (emphasis added). Stanfield's resistance is analyzed below as the third factor of the *Graham* test. Stanfield's hostility is analyzed in this section because it is subsumed under the third reason given by the officers to explain why they perceived Stanfield as a threat: his "argumentative demeanor."

The audio and video recordings reveal that Stanfield was not completely cooperative with the officers before they employed the use of force. When Garman asked if Stanfield had been drinking, he replied, "What makes the difference?" Then, when Garman attempted to remove Stanfield's right hand from his pocket, Stanfield quickly yanked his hand out of his pocket and turned away from Garman. Later, when the officers attempted to put Stanfield's arms behind his back, he stated, "Hey, wait a minute. Don't do this." While not completely cooperative behavior, this alleged "argumentative demeanor" was not threatening or hostile, either verbally or physically. Therefore, Stanfield's intoxicated state, coupled with his demeanor, would not have led a reasonable officer to conclude that Stanfield was a materially greater threat than any non-intoxicated person.

3. Active Resistance

The officers argue that, based on the perceived threat explained above, they needed to handcuff Stanfield so they could pat him down for weapons. It was in pursuit of this goal that the three officers used the force challenged in this case. The video shows that, while Garman and Montgomery held Stanfield's hands behind his back, Stanfield leaned forward, attempted to raise his right arm, and twisted his body to the left. This movement prompted Montgomery's takedown.

While Stanfield was on the ground, Montgomery and Garman struggled to remove his arms from underneath him. The video shows Montgomery kneeling and laying on Stanfield's

back as he used rough "muscling techniques" to gain control of Stanfield's arms. In response to the officers' orders to remove his hands from beneath his body, Stanfield replied, "I can't. Quit (kneeing or beating) me." It was during this struggle that Garman kneed Stanfield in the ribs at least twice, fracturing one of his ribs. This is also when Rode struck Stanfield twice in the legs with his flashlight. In arguing that their actions were not objectively unreasonable, the officers rely heavily on this court's holdings in *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015) and *Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007).

In *Rudlaff* we stated, "Active resistance includes physically struggling with, threatening, or disobeying officers. And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance. . . . A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff*, 791 F.3d at 641-42 (internal quotation marks and citations omitted).

The instant case is distinguishable from *Rudlaff* in several meaningful ways. In *Rudlaff*, the plaintiff admitted to being verbally defiant, he twice swung his arms in one officer's direction, and he admittedly refused to give the officers his hands to avoid being handcuffed. *Rudlaff*, 791 F.3d at 642. Here, Stanfield maintains that he was not resisting and that the only reason he did not produce his hands while on the ground was because the officers prevented him from doing so by kneeing him repeatedly and kneeling or laying on him. He cites his statement, "I can't. Quit (kneeing or beating) me," as evidence of this.

Accepting Stanfield's factual assertions, we assume that Stanfield was attempting to comply but could not because of the force being used on him. In that case, it would not have

been reasonable for an officer on the scene to have perceived the struggle as the same "active resistance" contemplated by *Rudlaff*.

In *Marvin*, an elderly plaintiff told the officer that he could not place his arms behind his back to be handcuffed because it was too painful to do so. *Marvin*, 509 F.3d at 246. The officer forced his arms behind his back anyway, causing the plaintiff to suffer a fractured shoulder. *Id.* This court held, "While Marvin's alleged physical disability weighs against [the officer's] actions, the fact remains that Marvin was resisting arrest." *Id.* However, in considering the full context of the situation, we added, "Arguably, Marvin's method of resisting could be characterized as passive such that the resistance was not so great as to require [the officer's] allegedly rough treatment." *Id.*

Stanfield's case, while similar to *Marvin*, is materially distinct because he alleges that he was not refusing to produce his hands. Rather, according to him, he was prevented from producing his hands by the officers themselves.

4. Whether the Force was Reasonable under the Totality of the Circumstances

Combining the analysis from the three aforementioned *Graham* factors, we must determine whether each individual officer's use of force was objectively reasonable under the totality of the circumstances.

a. *Officer Montgomery*

Stanfield argues that his leaning and twisting prior to Montgomery's takedown was the result of him losing his balance, not active resistance. However, as we are required to view the plaintiff's factual allegations from the perspective of a reasonable officer on the scene, these movements could reasonably have been perceived as resistance.

Notwithstanding, Montgomery's takedown was objectively unreasonable. Slight twisting and leaning by a portly, elderly man while two young officers hold his arms behind his back does not justify the tackle executed by Montgomery. Stanfield's crime was moderately severe and there was little reason to suspect he presented an immediate threat. Therefore, Montgomery's conduct was objectively unreasonable and violated Stanfield's constitutional rights.

b. *Officer Garman*

Garman's knee strikes were administered in an attempt to secure Stanfield's arms while he was on the ground. Again, Stanfield's crime was moderately severe and there was little reason to suspect he presented an immediate threat. This is especially true for Garman, who, after Stanfield was handcuffed but before he was searched, told his fellow officers that he was "sure" Stanfield was not carrying a gun.

For the reasons explained above, Stanfield's failure to produce his arms while he was on the ground is not the sort of "active resistance" addressed in *Rudlaff*. Garman saw Montgomery on top of Stanfield and heard Stanfield say, "I can't [produce my hands]." Even if Garman did not believe him and perceived the struggle to be a form of resistance, "the resistance was not so great as to require [the officer's] allegedly rough treatment." *Marvin*, 509 F.3d at 246. Therefore, considering the totality of the circumstances, it was objectively unreasonable for Garman to administer the kind of force that fractured Stanfield's rib. Garman violated Stanfield's constitutional rights.

c. *Officer Rode*

The analysis for Rode is very similar to that for Garman. Although the level of force used was not as aggressive as Garman's, it was nevertheless objectively unreasonable to strike Stanfield for not producing his hands in view of the two officers kneeling on him and kneeing

11

him, and after Stanfield had expressed his inability to produce his hands. Rode violated Stanfield's constitutional rights.

## B. Whether the Rights Violated were "Clearly Established"

To defeat a defendant's claim of qualified immunity, a plaintiff must show that the right violated is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal quotation marks and citations omitted).

At first blush, it may seem counterintuitive that a government official can violate a person's constitutional rights but still receive qualified immunity from suit because those rights were not sufficiently "clearly established." In an attempt to explain that distinction, we have stated, "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Rudlaff*, 791 F.3d at 644 (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

When determining whether a particular law or right is "clearly established," courts should not define it "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks and citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id*. "The dispositive question is whether the violative nature of *particular* conduct is clearly established. . . . Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual

situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks and citations omitted).

Even so, "[a]n action's unlawfulness can be apparent even in novel factual circumstances 'so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 607 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "[A] right can be clearly established even if there is no case involving 'fundamentally similar' or 'materially similar' facts." *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003) (quoting *Hope*, 536 U.S. at 741). "[A] right is clearly established when '[t]he reasoning, though not the holding,' of a prior court of appeals decision puts law enforcement officials on notice, or when the 'premise' of one case 'has clear applicability' to a subsequent set of facts." *Id.* (quoting *Hope*, 536 U.S. at 743).

Broadly speaking, "[t]his court has held that the right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). Stanfield cites several cases that, according to him, "clearly establish" that the three officers' particular conduct was in violation of the law.

1. Officer Montgomery

Although Stanfield argues that he lost his balance and was not trying to resist the officers' attempts to handcuff him, it was reasonable for Montgomery to perceive Stanfield's movements as resistance, albeit slight resistance. Two of the cases Stanfield cited, *Lawler v. City of Taylor*, 268 F. App'x 384 (6th Cir. 2008) and *Malory v. Whiting*, 489 F. App'x 78 (6th Cir. 2012), are somewhat analogous to this case. However, the reasoning in those cases does not apply here because neither of those cases involved a plaintiff who could reasonably have been

13

perceived to be resisting when he was tackled. *See Lawler*, 268 F. App'x at 386; *Malory*, 489 F. App'x at 80.

Stanfield has cited no case that "clearly establishes" that it is a violation of the law for an officer to "take down" a suspect who is resisting arrest. Therefore, despite the fact that Montgomery violated Stanfield's constitutional rights, he is nevertheless entitled to qualified immunity on the excessive force claim because Stanfield has not demonstrated that it was "clearly established" that such conduct was in violation of the law.

2. Officer Garman

Garman fractured Stanfield's rib in an attempt to secure his hands, even as Montgomery was on top of Stanfield's back and Stanfield was saying that he was incapable of removing his arms from under himself. Of the cases Stanfield cited to demonstrate that the unlawfulness of this conduct was "clearly established," the most analogous is *Lawler*.

In *Lawler*, an officer tackled a suspect in the booking room, kneed him in the back twice, and elbowed him, resulting in a broken arm. *Lawler*, 268 F. App'x at 386. This court found that, even though the suspect resisted being handcuffed while on the ground, the plaintiff's "right to be free from such force was clearly established." *Id*. at 388.

However, *Lawler* is readily distinguishable from the instant case because its reasoning was premised on the fact that the force took place "in a booking room—beyond the point at which any threat could have been reasonably perceived." *Id*. ("[O]ur cases clearly established Lawler's right to be free from gratuitous force during booking"). As such, a reasonable officer would not be on notice that the reasoning in *Lawler* applied to situations outside of a booking room or in a context in which "any threat could have been reasonably perceived." Therefore,

14

despite the fact that Garman violated Stanfield's constitutional rights, he is nevertheless entitled to qualified immunity on the excessive force claim.

   3. Officer Rode

Rode struck Stanfield in the leg twice with his flashlight in an attempt to coerce Stanfield into giving Montgomery and Garman his hands. Of the cases Stanfield cited to demonstrate that the unlawfulness of this conduct was "clearly established," the most analogous is *Harris v. City of Circleville*, 583 F.3d 356 (6th Cir. 2009). In *Harris*, the plaintiff was handcuffed with his hands behind his head when officers ordered him to kneel down. The plaintiff told them that he could not comply because one of the officers was pulling his arms behind him. *Harris*, 583 F.3d at 360. In response, that officer "struck Harris in the back of the knee, in an attempt to get his knee to buckle. [Another officer] administered two peroneal strikes to the left side of Harris's leg." *Id.* In *Harris*, we held that "there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Id*. at 367.

The important distinction here is the fact that the plaintiff in *Harris* was clearly subdued when the second officer administered the peroneal strikes. In the instant case, from the perspective of Rode, there was still a struggle taking place between the other two officers and Stanfield. As such, a reasonable officer would not be on notice that the reasoning in *Harris* applied to situations where a suspect was not subdued, or at least in handcuffs, like the plaintiff in *Harris*. Therefore, despite the fact that Rode violated Stanfield's constitutional rights, he is nevertheless entitled to qualified immunity on the excessive force claim.

## C.  Municipal Liability

Stanfield's claims against the City and its police chief are for deficient hiring and supervision of the three officers, alleging the existence of a custom of tolerance for officers who violated the constitutional rights of others.  From the outset, it should be noted that the claim against the police chief in his official capacity is properly deemed to be against the City.  *See Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 564 (6th Cir. 2011).

The City of Lima first argues that Stanfield cannot prevail on his municipal liability claims because the three officers committed no constitutional violations.  Indeed, we have held, "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  However, having found that the three officers violated Stanfield's constitutional rights, this argument is unavailing.

The City also argues that it is entitled to summary judgment because Stanfield has not carried his burden of establishing the elements of his "custom of tolerance" claim.  "A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.  A plaintiff can make a showing of an illegal policy or custom by demonstrating . . . the existence of a custom of tolerance or acquiescence of federal rights violations.  A municipality may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Burgess*, 735 F.3d at 478 (internal quotation marks and citations omitted).

Stanfield claims that the City of Lima cultivated a custom of tolerance or acquiescence toward uses of excessive force.  To prove this, a plaintiff must show: "(1) the existence of a clear

and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir.1996)).

On appeal, Stanfield attempts to establish the first element of this test, the pattern of illegal activity, by referencing eight complaints filed against Montgomery in the years between 2008 and 2016—all for verbally aggressive or physically violent conduct. The investigation reports in the record show that the police department investigated each of these complaints. Montgomery was exonerated of wrongdoing following each complaint. Therefore, there is no record of illegal activity by Montgomery, making it impossible for the City to have ignored a pattern of it.

Stanfield argues, "Logically, if the municipality is actually ignoring the problem of repeated constitutional violations, there will be no record of repeated constitutional violations. Any investigation will find no wrongdoing, since the municipality will be deliberately ignoring any wrongdoing. Thus, the only evidence of a pattern . . . in a situation like this is the complaints themselves." While Stanfield's point is well taken, the facts of this case do not allow him to overcome Defendants-Appellees' summary judgment motion. The mere existence of complaints, without more, is not sufficient evidence to allow a reasonable jury to find the existence of a clear and persistent pattern of illegal activity. *See generally Thomas*, 398 F.3d at 430-33. Therefore, Stanfield cannot establish that the City had a custom of tolerance for federal rights violations. Accordingly, the City of Lima and its police chief are not liable under § 1983.

**III.    CONCLUSION**

For the abovementioned reasons, we **AFFIRM**.

**KETHLEDGE, Circuit Judge, concurring in part and concurring in the judgment.**
For substantially the reasons stated by the majority, I agree that the officers here did not violate Stanfield's clearly established rights. But I would also hold that they did not violate Stanfield's rights at all. The officers received a report that Stanfield was driving an RV around the city while intoxicated. They approached Stanfield in an unlit vacant lot, late at night. Stanfield was in fact obviously drunk and kept putting his hand in his jeans pocket, despite the officers' repeated demands that he not do that. Finally they told him they were going to pat him down. At that point—as the cruiser's dash-cam video makes clear—Stanfield resisted the pat-down search and then forcibly resisted the officers' attempts to handcuff him. In my view that resistance continued well past the point that the majority thinks it stopped, since for another 20 seconds the video shows Stanfield rolling around on the ground and trying to keep the officers from controlling his arms. And it was only after the fourth or fifth time that the officers told Stanfield to "put your hands behind your back," that he responded, "I can't." Under these circumstances, the officers' force—a knee to the ribs and a flashlight strike on his calf—was as calibrated as it needed to be. *See, e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015).