FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**February 17, 2022**

_____

Christopher M. Wolpert
Clerk of Court

BRAD LAMB,

　　Plaintiff - Appellant,

v.

MONTROSE COUNTY SHERIFF'S OFFICE; RICK DUNLAP, Sheriff, in his official and individual capacities; ADAM W. MURDIE, Undersheriff, in his official and individual capacities; BEN HALSEY, Lieutenant, in his official and individual capacities; JASON GRUNDY, Deputy, in his official and individual capacities,

　　Defendants - Appellees.

No. 19-1275
(D.C. No. 1:16-CV-03056-RM-GPG)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

Former deputy sheriff Brad Lamb asserts retaliation claims against his former

employer, the Montrose County Sheriff's Office (MCSO), and certain former

colleagues under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to

2000e-17; the Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. §§ 24-34-

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. _See_ Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

401 to 24-34-406; and the First Amendment. The district court rejected Lamb's

claims, and he appeals.

We affirm. We hold that Lamb's private text message to a friend—vaguely

alleging racism and a lack of professionalism at the MCSO—did not oppose an

employment practice made unlawful by Title VII and therefore was not protected

activity, so his Title VII and CADA claims fail. We further hold that Lamb's First

Amendment claims fail because the content, form, and context of his text message

demonstrate it did not involve a matter of public concern, a concept that courts

construe very narrowly in the context of First Amendment retaliation claims. But

even if it did, the defendants sued in their individual capacities are entitled to

qualified immunity because the law was not clearly established that the message

involved a matter of public concern.

### Background[1]

Lamb began working for the MCSO as a deputy sheriff in September 2014,

supervised by Deputy Steven Collins. Sergeant Matthew Taramarcaz supervised both

Lamb and Collins, and Taramarcaz, in turn, was supervised by Lieutenant Ben

Halsey. Collins repeatedly made racist remarks in the office, including disparaging

comments about Mexicans in front of Deputy Brittany Martinez, who is of Mexican

descent. Around November 2014, Lamb told Taramarcaz that he was offended by

---

[1] We take these facts from the summary-judgment record and construe them in the light most favorable to Lamb, the nonmoving party. *See Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1249 (10th Cir. 2020).

2

Collins's comments and that he thought Taramarcaz condoned them. Despite Lamb's report, Collins's racist remarks continued. Collins and Taramarcaz were both eventually subject to disciplinary action for their conduct.

In December 2014, Lamb sent a text from his personal cellphone to Robert Thomas, his "close friend" and the Chief of Police at the Delta Police Department, where Lamb had previously worked. App. vol. 2, 401. Lamb texted: "Just wanted to stay in touch. REALLY big mistake coming to work here. Racism, good Ole boy, no professionalism. Let me know if you and Angie are still up for poker." *Id.* at 412. In his deposition, Lamb explained that this was "a private message from [his] phone to [Thomas's]," characterizing it as "a statement" rather than "a complaint." *Id.* at 394. Lamb further explained that he sent the message to Thomas because he was "seeking some guidance on what direction [he] should take." *Id.* at 401. Lamb did not elaborate on the guidance he was seeking but noted that he was "disappointed with the culture of racism at the [MCSO]." *Id.* at 394.

Although Lamb testified that he had no idea how it happened, word of the text message made its way to the MCSO. The record indicates that Thomas shared Lamb's text message with an employee at the Delta Police Department and that this employee, in turn, shared it with a member of the MCSO. In February 2015, Sheriff Rick Dunlap initiated an investigation based on a report that Lamb might have violated MCSO policies "by contacting another law[-]enforcement agency and communicating defamatory opinions of the [MSCO]." App. vol. 1, 221.

3

As a part of the MCSO investigation, Lamb submitted a statement detailing the racist and sexist conduct by Collins and others and referencing his earlier report to Taramarcaz regarding Collins. The next day, Undersheriff Adam Murdie issued Lamb a disciplinary report, stating that Lamb had violated MCSO policy by engaging in unbecoming conduct and by publicly criticizing the MCSO. Lamb was suspended for one day, and a copy of the disciplinary report was placed in his personnel file.

Over the next several months, Lamb was subject to additional disciplinary action. In a May 2015 incident involving a person threatening suicide, Deputy Jason Grundy issued Lamb a disciplinary report for insubordination, writing that Lamb "displayed unsatisfactory performance by clearing from a call, then disregarding radio traffic several times and involving himself back into the call without notifying dispatch[,] other crew members[,] or his crew supervisor." *Id.* at 242. Grundy further stated that after Lamb wrote his report regarding the call, Lamb refused to place a "full header" on the report. *Id*. According to Halsey, Lamb told Halsey that he should have included the header but chose not to because Lamb did not respect Grundy as a supervisor. Lamb, for his part, testified that Grundy never told him to add a header. In any event, Grundy recommended—and Halsey agreed—that Lamb receive additional training and counseling. Halsey also recommended a copy of the disciplinary report be placed in Lamb's personnel file.

About three months later, Grundy reported that Lamb had improperly filed an affidavit without Grundy's review, although Lamb denied that Grundy asked him to review the affidavit. Around the same time, Lamb was also written up for improperly

4

completing two police reports. As a result of these two incidents, Lamb was found to have engaged in unsatisfactory performance and insubordination. "[F]urther investigation" was recommended regarding Lamb's insubordination. *Id.* at 248.

A few days after this report, Halsey recommended Lamb's termination. Murdie agreed with Halsey and recommended the same, noting that because Lamb "had multiple sustained allegations" in under one year on patrol at the MCSO, he could "no longer be an effective, trustworthy employee." *Id.* at 258. The next day, on September 15, 2015, the MSCO terminated Lamb's employment.

Lamb sued, asserting Title VII and CADA retaliation claims against the MCSO. He also brought a claim under 42 U.S.C. § 1983 for First Amendment retaliation against Murdie, Dunlap, and Grundy (together, the individual defendants), in their individual and official capacities.[2]

The individual defendants moved to dismiss the First Amendment retaliation claims against them. The district court dismissed Murdie in his individual and official capacities. But it permitted the claim against Grundy to proceed in part (in his individual and official capacities) with respect to the disciplinary action following the May 2015 incident. It also permitted the claim against Dunlap to proceed in part (also in his individual and official capacities) for his conduct related to Lamb's termination. The district court denied Lamb leave to amend his complaint.

---

[2] Lamb also asserted a First Amendment claim against Halsey, but he does not pursue that claim on appeal, so we do not consider it further.

After discovery, the individual defendants and the MSCO moved for summary judgment on Lamb's remaining claims. On Lamb's Title VII and CADA retaliation claims, the district court granted summary judgment to the MSCO, concluding that Lamb failed to establish a prima facie case of retaliation and failed to show pretext. On Lamb's First Amendment claims, the district court granted summary judgment to Grundy in his individual capacity, concluding Lamb had offered no evidence establishing (1) that the text message was a substantial factor in Grundy's decision to discipline Lamb after the May 2015 incident or (2) that Grundy would not have written him up anyway. It also dismissed the claim against Grundy in his official capacity, finding Lamb had waived such claim by failing to make an argument on that front. Finally, the district court granted summary judgment to Dunlap in his individual capacity, concluding that Lamb's disciplinary infractions were sufficient reason to terminate him and rejecting Lamb's contention that Dunlap would not have terminated him in the absence of the text message. Given its conclusion that Dunlap committed no underlying constitutional violation, the district court also granted summary judgment on the First Amendment claim in Dunlap's official capacity.

Lamb appeals. He challenges the district court's dismissal of his First Amendment claims against Dunlap, Grundy, and Murdie, as well as the district court's decision denying him leave to amend his complaint. Lamb also appeals the grant of summary judgment to the MCSO on his Title VII and CADA claims and to Dunlap and Grundy on his First Amendment claims.

**Analysis**

We review a summary-judgment order "de novo, applying the same standard as the district court." *Brown v. Austin*, 13 F.4th 1079, 1084 (10th Cir. 2021). "Under that standard, summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting *Talley v. Time*, 923 F.3d 878, 893 (10th Cir. 2019)). "A fact is 'material' if, under the governing law," it could affect "the outcome of the lawsuit." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (quoting *Horizon/CMS Healthcare*, 220 F.3d at 1190). Additionally, we may "affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) (quoting *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1108 (10th Cir. 2009)).

I.     **Title VII and CADA Retaliation Claims**

Lamb argues that the district court erred in granting summary judgment to the MSCO on his Title VII and CADA retaliation claims. "Colorado and federal law apply the same standards to discrimination claims," so the governing law for these two claims is identical. *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010). Thus, Lamb's Title VII and CADA claims rise and fall together. *See id.*

"Title VII's anti[]retaliation provision (the opposition clause) bars an employer from discriminating against an individual who has 'opposed any practice made an unlawful employment practice' by the statute." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (quoting 42 U.S.C. § 2000e-3(a)). When analyzing such retaliation claims, "we apply the three-part test established in *McDonnell Douglas Corporation v. Green*, [411 U.S. 792 (1973)]," which first requires Lamb to establish a prima facie case of retaliation. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008). To make his prima facie case, Lamb "must show that: (1) []he engaged in protected activity; (2) []he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1123–24 (10th Cir. 2007)). Should Lamb succeed in establishing a prima facie case, the MCSO "must offer a legitimate, non[]retaliatory reason for [its] employment action." *Id.* (second alteration in original) (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006)). And if the MCSO makes that showing, the burden shifts back to Lamb to show that the MCSO's "proffered reason is pretextual." *Id.* (quoting *Metzler*, 464 F.3d at 1170).

Applying these standards, the district court concluded that Lamb failed to establish a prima facie case of retaliation. It began by identifying two adverse actions by the MCSO—Lamb's February 2015 suspension and Lamb's September 2015 termination. From there, the district court analyzed Lamb's text message to Thomas

as the alleged protected activity that resulted in Lamb's 2015 suspension, concluding that the text message did not constitute protected activity because it did not oppose an unlawful employment practice under Title VII.

Turning to Lamb's 2015 termination, the district court "assume[d]" that Lamb's November 2014 report to Taramarcaz and February 2015 written comments about misconduct at the MSCO "satisf[ied] the first two elements" of Lamb's prima facie case of retaliation. App. vol. 3, 582–83. It then concluded that Lamb failed to establish the causation required for a prima facie case and thus rejected Lamb's Title VII and CADA claims.[3]

On appeal, despite the district court's consideration of three separate sources of protected activity, Lamb's only proffered source of protected activity is his text message to Thomas. He has therefore waived any argument that his other conduct constituted protected activity.[4] *See McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010). We accordingly consider only the text message.

Thus, to withstand summary judgment on his Title VII and CADA retaliation claims, Lamb must establish that his text message to Thomas constituted protected

---

[3] The district court also noted, in passing, that Lamb failed to satisfy the third *McDonnell Douglas* prong—that the MSCO's reasons for terminating him were pretextual. We do not reach this ruling because we conclude that Lamb's Title VII and CADA claims fail at the first *McDonnell Douglas* prong.

[4] Lamb does rely on his other conduct—the November 2014 report to Taramarcaz and the February 2015 written statement—to bolster his argument that the text message itself is protected conduct. But he makes no meaningful argument that either the report or the written statement independently qualifies as protected conduct.

opposition to an unlawful employment practice. We agree with the district court that it does not. To show he engaged in protected activity, Lamb does not need to show that he "reported an actual Title VII violation." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018). Rather, he need only show "'a reasonable good-faith belief that' []he was opposing discrimination." *Id.* (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004)). Indeed, protected opposition in the context of retaliation claims has a "broad definition." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 926 (10th Cir. 2016). But that definition is not boundless: We have explained that "protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (quoting *Hertz*, 370 F.3d at 1015). And crucially, as the district court observed, to be protected, the plaintiff must oppose a "practice made an unlawful employment practice by Title VII." *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009) (quoting *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002)).

Lamb broadly asserts that his text message—alleging "Racism, good Ole boy, no professionalism," App. vol. 2, 412—"touched on" issues "addressed by Title VII." Aplt. Br. 56. That may be, but the statute requires more. Indeed, "not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (quoting *Little v. United Techs., Carrier Transicold Div.*,

10

103 F.3d 956, 959 (11th Cir. 1997)); *see also* § 2000e-3(a); *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016) (dismissing retaliation claim because employee's complaints did not "oppose any discrete practice that [the plaintiff] reasonably could have believed discriminated on the basis of race, color, religion, sex, or national origin"); *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) ("The employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to *some* practice by the employer that is allegedly unlawful."). Put another way, there must be "some perceptible connection to the employer's alleged illegal employment practice," and "it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006); *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding "that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice").

The Ninth Circuit's decision in *Crown Zellerbach* is instructive. 720 F.2d 1008. There, the plaintiffs sent a letter to company officials and the local school board (a customer of the company) after the school board gave an affirmative-action award to a company official. *Id.* at 1011, 1013. And although the letter included an allegation that the company official was bigoted—which the court noted would not be enough, on its own, to constitute protected opposition—the letter also "specifically mentioned the history of unlawful employment practice charges filed

11

against [the employer] by black employees pursuant to Title VII." *Id.* at 1013; *see also id.* at 1011. Additionally, the letter "stressed that [the employer] had engaged in a continuing series of unlawful discriminatory employment practices, and that, if the school[-]district officials had consulted the entire record, they would have discovered the persistent complaints about these practices." *Id.* at 1013. Thus, the Ninth Circuit concluded that the letter was protected activity because it was aimed at a specific unlawful employment practice. *See id.* at 1014. But here, unlike the letter in *Crown Zellerbach*, Lamb's vague text message takes no such aim.

Lamb's arguments to the contrary are not persuasive. He contends that Title VII does not limit who may complain of discrimination, to whom a complaint may be made, or the form of the complaint. But assuming these propositions to be true, they do not establish—as Lamb must—that his text message opposed an unlawful employment practice.

Nor do Lamb's cited authorities aid him in making that showing. For instance, Lamb relies on *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130 (5th Cir. 1981). There, the Fifth Circuit affirmed the district court's conclusion that boycotting and picketing activity was protected conduct, rejecting the employer's assertion that the boycotting was directed toward inequality in public accommodation generally and not at the employer's unlawful employment practice in particular. *Payne*, 654 F.2d at 1137 n.7. But in *Payne*, the "purpose of the boycott and picketing" was to oppose the employer's "discrimination against blacks in hiring and promotion." *Id.* at 1136. That is, the opposition was targeted at the defendant-

12

employer's "unlawful employment practice," not merely racism in general.[5] *Id.* at 1137.

Here, by contrast, Lamb's statement makes no mention of any allegedly unlawful employment practice by the MCSO. In his opening brief, Lamb contends that the text message was protesting "the creation of a hostile workplace for Hispanics." Aplt. Br. 57. But his message to Thomas made no mention of any hostile workplace. Lamb essentially concedes as much, noting that his text message "about racism might be ambiguous without greater knowledge of the context and purpose behind it." *Id.*; *see also Curay-Cramer*, 450 F.3d at 135 ("When deciding whether a plaintiff has engaged in opposition conduct, we look to the message being conveyed.").

To summarize, the relevant portion of Lamb's text message—"Racism, good Ole boy, no professionalism," App. vol. 2, 412—amounts to a general statement about the alleged existence of racism and is not directed at any unlawful employment practice by the MSCO. As a result, the text message does not constitute protected activity, and Lamb fails to establish a prima facie case of retaliation. We therefore affirm the district court's grant of summary judgment to the MSCO on Lamb's Title VII and CADA retaliation claims.

---

[5] Lamb also cites a Sixth Circuit decision, *Johnson v. University of Cincinnati*, 215 F.3d 561 (6th Cir. 2000). But the central issues in that case were whether the plaintiff's "manner of . . . opposition" was reasonable and whether he "opposed conduct which he reasonably believed to be unlawful." *Johnson*, 215 F.3d at 580–81. Thus, *Johnson* does not help Lamb overcome the dispositive issue here—that his text message failed to oppose an unlawful employment practice.

II.    **First Amendment Retaliation Claims and Qualified Immunity**

Lamb contends that the individual defendants, acting in their individual capacities—and Dunlap in his official capacity—terminated his employment in retaliation for the exercise of his First Amendment right to free speech in sending the text message to Thomas. The individual defendants invoke the doctrine of qualified immunity to shield themselves from liability.

"[Q]ualified immunity protects officials from civil liability as long as they do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Once a defendant raises qualified immunity, the plaintiff bears the burden to show that the defendant is not entitled to immunity." *Id.* To meet that burden, the plaintiff must show "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Duda v. Elder*, 7 F.4th 899, 909 (10th Cir. 2021) (quoting *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015)). We have the discretion to begin our qualified-immunity analysis with either prong, but we elect to proceed sequentially. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A.    **Constitutional Violation**

Lamb argues that the district court erred in finding the individual defendants did not violate his First Amendment right. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of

public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). In other words, "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.*; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). At the same time, "a public employer has a legitimate interest 'in promoting the efficiency of the public services it performs through its employees.'" *Singh v. Cordle*, 936 F.3d 1022, 1034 (10th Cir. 2019) (quoting *Garcetti*, 547 U.S. at 417). As the Supreme Court has held, "when a public employee speaks not as a citizen upon matters of public concern, but" rather "as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983).

To evaluate whether a public employer violated its employee's constitutionally protected interest in free speech, courts use the five-step *Garcetti*/*Pickering* test, which considers:

> (1) whether the speech was made pursuant to an employee's official duties;
>
> (2) whether the speech was on a matter of public concern;
>
> (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;
>
> (4) whether the protected speech was a motivating factor in the adverse employment action; and

15

(5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Singh*, 936 F.3d at 1034 (quoting *Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017)). The first three steps "determine whether the speech was constitutionally protected" and "are ordinarily matters of law for a court to decide"; "the final two steps are ordinarily questions of fact." *Id.*

Although the district court determined that Lamb could not establish the fourth and fifth steps of the *Garcetti/Pickering* analysis, we resolve Lamb's First Amendment claims at the second step. We conclude that Lamb's text message to Thomas did not involve a matter of public concern and therefore is not protected by the First Amendment. *See Lincoln*, 900 F.3d at 1180 (permitting affirmance on any ground supported by record).

"Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) (quoting *Leverington v. City of Colo. Springs*, 643 F.3d 719, 727 (10th Cir. 2011)). "Courts construe 'public concern' very narrowly." *Butler v. Bd. of Cnty. Comm'rs*, 920 F.3d 651, 656 (10th Cir. 2019) (quoting *Leverington*, 643 F.3d at 727). To assess whether speech pertains to a matter of public concern, we consider "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 657 (quoting *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1181 (10th Cir. 2018)). The "speech must not merely relate generally to a subject matter that is of public interest, but must 'sufficiently inform the issue as to be helpful to the

16

public in evaluating the conduct of government.'" *Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995) (quoting *Wilson v. City of Littleton*, 732 F.2d 765, 768 (10th Cir. 1984)). "In several cases we have described the relevant legal question as whether the employee's *primary* purpose was to raise a matter of public concern." *Singh*, 936 F.3d at 1035. But if the speech aims "simply to air grievances of a purely personal nature," it is generally not protected, and the plaintiff cannot establish a violation of his or her First Amendment right. *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1225 (10th Cir. 2000) (quoting *Schalk v. Gallemore*, 906 F.2d 491, 495 (10th Cir. 1990)).

We begin with the content of Lamb's text message to Thomas. Lamb's text opened with the statement "Just wanted to stay in touch," and then stated that it was a "REALLY big mistake coming to work here." App. vol. 2, 412. These remarks convey Lamb's dissatisfaction with his employment and do not suggest that his "primary purpose was to raise a matter of public concern." *Singh*, 936 F.3d at 1035 (emphasis omitted). Next, Lamb wrote "Racism," "good Ole boy," and "no professionalism" without additional explanation or description. App. vol. 2, 412. These free-floating terms weigh against finding Lamb's text message involved a matter of public concern because they do not "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." *Moore*, 57 F.3d at 932 (quoting *Wilson*, 732 F.2d at 768). Lamb closed by stating, "Let me know if you and Angie are still up for poker." App. vol. 2, 412. Like the opening sentence about staying in touch, this closing statement further highlights the "personal nature" of

17

Lamb's text to Thomas. *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1234 (10th Cir. 1998).

Looking beyond the content of the text message, its form and context also indicate that it did not involve a matter of public concern. These factors require us to examine, among other things, Lamb's "subjective intention" to determine whether his motive was "'was calculated to redress personal grievances or whether it had a broader public purpose.'" *Lee v. Nicholl*, 197 F.3d 1291, 1295 (10th Cir. 1999) (quoting *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996)).

Here, the form of the speech, a private text message to a close friend, again cuts in favor of concluding that the message did not involve a matter of public concern. Speech in a form intended for primarily private consumption weighs against such a finding; by contrast, speech in a form that may engender public action falls in favor of finding that it did involve a matter of public concern. *Compare Wren v. Spurlock*, 798 F.2d 1313, 1317–18, 1318 n.2 (10th Cir. 1986) (finding allegations "presented in the form of a letter from the majority of the school's faculty members calling for an investigation" involved matter of public concern and emphasizing importance of "[t]his mode of public presentation"), *and Wulf v. City of Wichita*, 883 F.2d 842, 860 n.26 (10th Cir. 1989) ("The form of the speech, a formal letter to the Attorney General seeking an investigation of alleged misconduct by a public official, emphasizes the public[-]concern element."), *and Graziosi v. City of Greenville*, 775 F.3d 731, 739 (5th Cir. 2015) (finding post to mayor's Facebook page, on which community members "could lobby [mayor] to take a particular action or apprise"

18

community members of ongoing events, "weigh[ed] in favor of finding that [plaintiff] spoke on a matter of public concern"), *with Sipes v. United States*, 744 F.2d 1418, 1423 (10th Cir. 1984) (holding that "[p]laintiff's statement to the Inspector General" in which he "complained about his being cited for infractions while others were not" did not involve matter of public concern), *and Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1361–63 (5th Cir. 1986) (concluding that entries from plaintiff's "personal notebook" that "fell into [his] supervisor's hands" did not involve matters of public concern when plaintiff "made no effort to communicate the contents of the notebook to the public"), *and Lumpkin v. Aransas Cnty.*, 712 F. App'x 350, 357 (5th Cir. 2017) (unpublished) (finding form of speech—text messages—weighed against finding speech involved matters of public concern because "[c]ommunications visible to the public are more likely to concern the public"). We do not suggest that a private message can never involve a matter of public concern, but Lamb's admittedly "private" text message to a close friend—neither visible to the public nor intended for public dissemination—falls far closer to the private end of this spectrum, weighing against finding it involved a matter of public concern. App. vol. 2, 394.

The same goes for the text message's broader context. Explaining his motivation for sending the text message, Lamb testified that he "sent a private message from [his] phone to [Thomas's]," and then reiterated that "it[ was] a private message between [Thomas] and [him]self." *Id*. And Lamb further testified that he had "no idea" how the text message made its way to the MCSO, *id.*, reinforcing the conclusion that Lamb did not intend his text message to be disseminated and did not seek

to "vindicate the public interest." *Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005).

Additionally, Lamb characterized his text message as "a statement," not "a complaint."

App. vol. 2, 394. He also testified that his reason for sending the text was to

"seek[] . . . guidance on what direction [he] should take," though he did not elaborate

on this point. *Id.* at 401.

To be sure, Lamb was a deputy sheriff, and he sent his text message to a close

friend, the police chief at his former place of employment. We agree with Lamb that

racism and unprofessionalism in a public entity—particularly in law enforcement—can

be matters of public concern, in a general sense. But "[b]ecause almost anything that

occurs within a public agency *could* be of concern to the public, we do not focus on the

inherent interest or importance of the matters discussed by the employee." *Terrell*, 792

F.2d at 1362. Rather, we examine "whether the speech at issue in a particular case was

made primarily in the plaintiff's role as citizen or primarily in his role as employee." *Id.*

In so doing, "the mere fact that the topic of the employee's speech was one in which the

public might or would have had a great interest is of little moment." *Id.* Put differently,

"[a] statement 'does not attain the status of public concern simply because its subject

matter could, in different circumstances, have been the topic of a communication to the

public that might be of general interest.'" *Leverington*, 643 F.3d at 727 (quoting

*Salehpoor v. Shahinpoor*, 358 F.3d 782, 788 (10th Cir. 2004)); *see also McEvoy v.*

*Shoemaker*, 882 F.2d 463, 466 (10th Cir. 1989) ("[S]peech which may be of general

interest to the public is not automatically afforded [F]irst [A]mendment protection.").

Accordingly, as we have just detailed, more than a vague mention of racism,

unprofessionalism, or the phrase "good Ole boy" is required before concluding that Lamb's text message involved a matter of public concern. App. vol. 2, 412. The speech must be motivated, in some way, "to disclose misconduct." *Lighton*, 209 F.3d at 1224; *see also Baca*, 398 F.3d at 1219 ("An employee's motivation for speaking is important to our analysis of whether the speech pertained to matters of public concern."); *Singh*, 936 F.3d at 1035 (explaining "the relevant legal question as whether the employee's *primary* purpose was to raise a matter of public concern"). On that score, Lamb's speech falls short.

Indeed, Lamb's text message is similar to the speech in *McEvoy*, 882 F.2d 463. There, a recently retired police lieutenant asserted that he was denied a promotion after writing a letter to the city council that—like Lamb's text—contained a mix of personal grievances and complaints about internal politics at the police department. *McEvoy*, 882 F.2d at 466. Considering "the entirety of [the plaintiff's] letter," we explained that his speech did not involve a matter of public concern because his "principal purpose in writing it was not to disclose 'malfeasance on the part of government officials in the conduct of their official duties'" but to "air his frustration" at not being promoted. *Id.* (quoting *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1988)).

So too here. Lamb's text message principally suggests personal dissatisfaction with having accepted employment at the MCSO, and Lamb's references to his personal relationship with Thomas along with Lamb's intent that the conversation remain private and not be disseminated further undermine any suggestion that

21

Lamb's "*primary* purpose was to raise a matter of public concern." *Singh*, 936 F.3d at 1035; *see also Maldonado v. City of Altus*, 433 F.3d 1294, 1310 (10th Cir. 2006) ("Ordinarily, for an employee's work-related speech to be on a matter of public concern, the speech must be uttered with an eye to action, to improve the public welfare, not just to remedy a personal grievance."), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

In sum, as noted earlier, we construe the public-concern inquiry "very narrowly." *Butler*, 920 F.3d at 656 (quoting *Leverington*, 643 F.3d at 727). Because the overall content, form, and context, of Lamb's speech demonstrate that it was primarily personal in nature, we conclude that it did not pertain to a matter of public concern. Therefore, his speech was unprotected, and his First Amendment claims against the individual defendants in their individual capacities fail.

The lack of a constitutional violation is also fatal to Lamb's official-capacity claim against Dunlap. "Suing individual defendants in their official capacities under § 1983," as we have recognized, "is essentially another way of pleading an action against the county or municipality they represent." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). As such, an official-capacity claim, like a claim against a municipality, "requires an underlying constitutional violation." *Rowell v. Bd. of Cnty. Comm'rs*, 978 F.3d 1165, 1175 (10th Cir. 2020). Lacking one here, Lamb's official-capacity claim fails.

22

B.      Clearly Established Law

Even if Lamb had established a First Amendment violation against the individual defendants in their individual capacities, those claims would nevertheless fail at the second prong of the qualified-immunity analysis because the law was not clearly established, at the time of the alleged violations, that Lamb's text message to Thomas involved a matter of public concern.[6]

"A right is 'clearly established' when every 'reasonable official would [understand] that what he is doing violates that right.'" *Maketa*, 880 F.3d at 537 (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). As the Supreme Court has repeatedly instructed, the right cannot be defined "at a high level of generality." *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). That is, "[t]he dispositive question is 'whether the violative nature of [the defendants'] particular conduct is clearly established.'" *Mullenix*, 577 U.S. at 12 (emphasis omitted) (quoting *al-Kidd*, 563 U.S. at 742). Thus, the plaintiff must point to "an applicable Supreme Court or Tenth Circuit opinion" or show "clear

---

[6] The MSCO and individual defendants contend that Lamb waived any argument as to whether the law was clearly established by failing to address it in his opening brief. "We need not opine on the waiver issue because we conclude that, in any event," Lamb's clearly established argument fails on the merits. *United States v. Wells*, 873 F.3d 1241, 1250 (10th Cir. 2017).

weight of authority from other courts treating the conduct as unconstitutional." *Maketa*, 880 F.3d at 537.

Lamb argues that clearly established law demonstrates his text message involved a matter of public concern. In support, he primarily relies on *Bass v. Richards*, 308 F.3d 1081 (10th Cir. 2002), *Connick*, 461 U.S. 138, and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979). But none of these cases helps Lamb meet his "heavy burden" to overcome the individual defendants' invocation of qualified immunity. *Maketa*, 880 F.3d at 544.

*Bass* involved private statements endorsing a specific political candidate due in part to the plaintiff's preference for that candidate's political philosophy. 308 F.3d at 1084, 1089–90. We observed that this sort of "pure political opinion . . . has been long protected" by the First Amendment. *Id.* at 1090. But the core political speech in *Bass* does not clearly establish that Lamb's private text message, vaguely alleging racism and unprofessionalism at the MSCO, involved a matter of public concern. Similarly, *Connick* concluded that the respondent's written question to her colleagues about whether they felt pressured to work in political campaigns pertained to a matter of public concern because such speech addressed a central issue about whether government service hinges on performance rather than political service. *See* 461 U.S. at 150. *Connick* therefore also sheds little light on whether a private text message vaguely alleging racism and unprofessionalism involved a matter of public concern. And finally, the Supreme Court reversed in *Givhan* because the lower court had erroneously applied a per se rule that privately expressed speech (there, a teacher's

24

speech related to a school and the broader school district's racially discriminatory policies) can never have First Amendment protection. 439 U.S. at 413–15. Indeed, Lamb's discussion of *Givhan*—which he says stands for the proposition that "privately expressed concerns on *progress of racial desegregation* are protected," Rep. Br. 16 (emphasis added)—shows that its facts are far removed from Lamb's privately expressed concerns about general racism and unprofessionalism untethered from any particular practices or events and connected, as they were, to comments about socializing with Thomas. In sum, none of the authorities Lamb cites are sufficiently "particularized to the facts of the case" to clearly establish that Lamb's text to Thomas involved a matter of public concern. *Knopf*, 884 F.3d at 947 (quoting *White*, 137 S. Ct. at 552).

What's more, our independent review of the public-concern caselaw reveals no such precedent. *See Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021) (noting that our review on qualified immunity "is not limited to the opinions cited by [the plaintiff]"). The form, content, and context of Lamb's speech are markedly different from the cases in which we have found speech to involve a matter of public concern. *See Butler*, 920 F.3d at 657. As an initial matter, we have found no cases concluding that a private text message to a friend involved a matter of public concern. Of course, that alone is not dispositive of the clearly established inquiry. *See Knopf*, 884 F.3d at 944 (noting that, for the law to be clearly established "there need not be a 'case directly on point'" (quoting *White*, 137 S. Ct. at 551)).

25

But in addition, we see no caselaw clearly establishing that the content and context of Lamb's text message rise to the level of public concern. For instance, in the cases holding that speech involved a matter of public concern, the plaintiffs raised concerns of specific misconduct within public institutions—hallmarks that Lamb's vague, private, and personal text message to Thomas lacks. *See Wulf*, 883 F.2d at 848–50, 857–58, 867 (holding former police officer's letter to Attorney General requesting investigation into allegations that police chief sexually harassed a subordinate, misused taxpayer funds, violated department policy, and held antiunion animus involved matters of public concern under clearly established law); *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998) (holding speech involved matter of public concern when plaintiff's motive was to bring to light possible mishandling of murder investigation, including withholding of exculpatory evidence); *Baca*, 398 F.3d at 1219 (holding speech involved matter of public concern when plaintiff made "repeated remarks alleg[ing] illegal financial dealings between a state university and a state agency").

Likewise, courts find speech involves matters of public concern when the speech "sufficiently inform[s] the issue as to be helpful to the public in evaluating the conduct of government," which Lamb's text also does not do. *Moore*, 57 F.3d at 932 (quoting *Wilson*, 732 F.2d at 768). For instance, in *Moore*, the plaintiff, a police officer, gave a speech to the city council "on a matter of public concern" when the speech "helped inform the public on an important subject that was of heightened concern in the community" after another officer's conduct "caus[ed] or

26

exacerbate[ed]" a local "riotlike incident." *Id.* But Lamb's text message, intended to remain private and bookended by personal comments that included misgivings about accepting employment with the MCSO and a reference to playing poker, does not similarly inform the public.

In sum, having considered the cases put forth by Lamb as well as conducting our own research, the individual defendants are also entitled to qualified immunity because "the law was not clearly established that" Lamb's text message "constituted speech on a matter of public concern." *Singh*, 936 F.3d at 1035. For this additional reason, Lamb's First Amendment individual-capacity claims fail.[7]

---

[7] Our ruling on the summary-judgment order disposes of Lamb's challenges to the district court's earlier dismissal order because, even if the district court erred in dismissing certain claims at that stage, those claims would fail at summary judgment for the reasons explained above. Thus, we do not separately consider those arguments. Relatedly, we reject Lamb's challenge to the district court's ruling denying him leave to amend his complaint. "[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it." *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186–87 (10th Cir. 1999). Here, in a one-sentence footnote in his opposition to the motion to dismiss, Lamb sought leave to amend only if the district court dismissed his official-capacity claims against the individual defendants, which the district court did not do. Such "a bare request to amend in response to a motion to dismiss is insufficient." *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014). Moreover, after the dismissal order, Lamb never moved to amend his complaint; and as we have explained, "normally a court need not grant leave to amend when a party fails to file a formal motion." *Id.* (quoting *Calderon*, 181 F.3d at 1186). Accordingly, the district court did not abuse its discretion in denying leave to amend.

**Conclusion**

Lamb fails to establish that his text message to Thomas was protected activity under Title VII's opposition clause because the text did not oppose an employment practice made unlawful by the statute. Accordingly, Lamb cannot establish a prima facie case and his Title VII and CADA claims fail. Lamb's First Amendment retaliation claims fail because, under the narrow construction of public concern, the overall content, form, and context of Lamb's text message to Thomas demonstrate that it was primarily private in nature and did not involve a matter of public concern. But even if it did, Lamb's individual-capacity claims would still fail because the law was not clearly established that the text message involved a matter of public concern.

Affirmed.

Entered for the Court

Nancy L. Moritz
Circuit Judge