**141 Nev., Advance Opinion 31**

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| CLARK COUNTY; AND GEORGINA STUART,<br>Petitioners,<br>vs.<br>THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK; AND THE HONORABLE SUSAN JOHNSON, DISTRICT JUDGE,<br>Respondents,<br>and<br>STEVE EGGLESTON, AN INDIVIDUAL,<br>Real Party in Interest. | No. 87906<br><br> |

Original petition for a writ of mandamus challenging a district court order denying a motion for summary judgment on immunity grounds in a 42 U.S.C. § 1983 and tort action.

*Petition granted.*

Olson, Cannon, Gormley & Stoberski and Felicia Galati and Stephanie A. Barker, Las Vegas,
for Petitioners.

Clark Hill PLLC and Paola M. Armeni and William D. Schuller, Las Vegas,
for Real Party in Interest.

---

25-26197

BEFORE THE SUPREME COURT, EN BANC.

*OPINION*

By the Court, HERNDON, C.J.:

In this opinion, we consider whether qualified and discretionary-act immunity apply to bar suit against a social worker who allegedly coerced a parent to sign guardianship papers permitting relatives to temporarily care for his children. Below, real party in interest Steve Eggleston sued petitioners Clark County and Georgina Stuart, an employee of the Clark County Department of Family Services (DFS), for violations of his due process rights after he signed temporary guardianship papers in the midst of an ongoing child abuse/neglect investigation, asserting that Stuart and the County forced him to do so on threat that his children would otherwise be forever removed from his care. Stuart and Clark County moved for summary judgment on the ground that their actions were protected by qualified immunity and discretionary-act immunity, but the district court denied their motion. Stuart and Clark County then filed this petition for a writ of mandamus challenging the order denying summary judgment. We conclude that our discretionary consideration of the petition is warranted and, determining that immunity bars the suit, grant the petition.

*FACTS AND PROCEDURAL HISTORY*

Eggleston and his former girlfriend Laura Rodriguez have two children together: R.E., born in December 2010, and H.E., born in July 2012. Rodriguez also has adult children from prior relationships, and she has been the subject of multiple Child Protective Services (CPS) investigations into abuse and neglect involving those other children. Rodriguez has had

ongoing problems with substance abuse that, in the years leading up to the pertinent events, resulted in a DUI conviction, the loss of her job and cosmetology license, and an overdose. On December 29, 2014, she told one of her adult daughters that she planned to kill herself. When the daughter reported this suicide threat to the police, DFS was notified and began investigating for potential risk to the children, with Stuart assigned to the case.

Stuart observed that Rodriguez's substance abuse was ongoing and Eggleston was struggling to make ends meet while providing supervision for the children. For example, when H.E. developed appendicitis, Eggleston was rarely able to visit him in the hospital due to his long work hours and instead left him in the care of Rodriguez, despite Rodriguez's routine abuse of alcohol and prescription medications at the time. At one point while under Rodriguez's care, H.E. fell into the family's pool and nearly drowned. As a result, Stuart worked on developing a plan to secure in-home services and support for the family by connecting Eggleston with local organizations and resources, including mental health support and rent assistance. Because Rodriguez's adult children, along with Rodriguez's sister Lisa Callahan—who was visiting from out of state— could provide supervision for the children, the DFS team determined that the in-home care plan was sufficient. Despite these efforts, however, the family faced numerous challenges in early January 2015, including imminent eviction, Rodriguez and Eggleston planning to separate due to Rodriguez seeking in-patient treatment for her substance abuse, and Callahan's departure from the home, all of which raised a serious question as to how Eggleston would provide for R.E. and H.E.

In light of these developments, Stuart, her supervisors, and other DFS employees met to discuss plans for the children's care and supervision. They ultimately agreed that, without the assistance the visiting family members had provided, Eggleston and Rodriguez likely would not be able keep their children safe, and a supervisor recommended the children's removal from the household and placement in the foster care system. Stuart proposed that, alternatively, Eggleston and Rodriguez could voluntarily assign temporary guardianship over R.E. and H.E. to the Callahans.

On January 7, 2015, Stuart visited the home to discuss the DFS team's proposed options for R.E. and H.E's care with Eggleston. She was accompanied by two police officers and Rodriquez's sister, Lisa Callahan. During the discussion, Stuart presented Eggleston with a choice: Eggleston could sign the proposed temporary guardianship papers, or DFS would place the children into protective custody and file an abuse and neglect petition with the court seeking the removal of the children from the home. Eggleston called his attorney and apprised her of the situation. Eggleston's attorney spoke directly with Stuart about the options available, and then his attorney advised him to accept the temporary guardianship. Taking his attorney's counsel, Eggleston, a formerly practicing attorney himself, signed the papers, which released the two minor children to the Callahans for up to six months. The Callahans returned to their home with the children, and Eggleston asserts that, from the date on which the temporary guardianship papers were signed, he has seen the children only once, at a legal proceeding where the Callahans live.

Eggleston subsequently sued Clark County and Stuart, asserting claims for substantive and procedural due process violations

SUPREME COURT
OF
NEVADA

(O) 1947A

4

under 42 U.S.C. § 1983 and for intentional infliction of emotional distress (IIED). Following discovery, Stuart and Clark County moved for summary judgment, arguing that qualified immunity and discretionary-act immunity foreclosed the § 1983 claims and the IIED claim, respectively. The district court denied the motion. Clark County and Stuart now petition this court for mandamus relief.[1]

## DISCUSSION

### We elect to entertain the writ petition

Writ relief is extraordinary. *Archon Corp. v. Eighth Jud. Dist. Ct.*, 133 Nev. 816, 822, 407 P.3d 702, 708 (2017). We may issue a writ of mandamus "in all cases where there is not a plain, speedy and adequate remedy in the ordinary course of law." NRS 34.170. "[T]he issuance of a writ of mandamus . . . is purely discretionary with this court." *Smith v. Eighth Jud. Dist. Ct.*, 107 Nev. 674, 677, 818 P.2d 849, 851 (1991). This court generally will not entertain petitions challenging the denial of summary judgment but may do so where "the relevant facts are not in dispute and a clear question of law, dispositive of the suit, is presented." *Bottorff v. O'Donnell*, 96 Nev. 606, 608, 614 P.2d 7, 8 (1980). Because we have not previously addressed whether a writ petition is the appropriate vehicle for challenging the denial of a summary judgment motion premised upon defenses of qualified and discretionary-act immunity, we take the opportunity to do so here.

When forced to face the "burdens of litigation" erroneously, public officials lose the protections of qualified and discretionary-act

---

[1]As the parties do not distinguish Clark County and Stuart for purposes of their immunity arguments, we treat them the same for such purposes as well.

immunity in their entirety. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (explaining that qualified immunity is meant to protect officials from pretrial matters as well as from standing trial). The denial of such immunity cannot be adequately remedied via traditional appeal from a final judgment because the protections constitute an "immunity from suit rather than a mere defense to liability." *Forsyth*, 472 U.S. at 526-27. The right to immunity "is effectively lost if a case is erroneously permitted to go to trial," as the public official cannot be reimmunized if erroneously required to face the burdens of litigation. *Id.* Recognizing this unique characteristic of such immunity, other states have permitted interlocutory review in similar circumstances where a question of law is at issue. *See, e.g., Tucker v. Resha*, 648 So. 2d 1187, 1190 (Fla. 1994); *Robinson v. Pack*, 679 S.E.2d 660, 665 (W. Va. 2009); *Furlong v. Gardner*, 956 P.2d 545, 550-51 (Colo. 1998). So too has the United States Supreme Court. *See Forsyth*, 472 U.S. at 530. The same is true of discretionary-act immunity. *See Martinez v. Maruszczak*, 123 Nev. 433, 447, 168 P.3d 720, 729 (2007) (indicating that, under NRS 41.032(2), discretionary-act immunity is "immunity from suit").

Although we have not previously addressed whether a petition for writ relief is an appropriate avenue to challenge a denial of immunity, we have observed that questions of immunity must be resolved at the earliest possible stage of litigation. *See Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 458, 168 P.3d 1055, 1061 (2007). We recognize that an improper denial of qualified and discretionary-act immunities subjects Stuart to the very litigation that those doctrines were adopted to guard against and may discourage similarly situated public officials from lawfully discharging their duties out of fear of being sued. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816

(1982) (qualified immunity prevents the "distraction of officials from their governmental duties" and the "deterrence of able people from public service"); *Forsyth*, 472 U.S. at 526-27 (a denial of qualified immunity is "effectively unreviewable on appeal from a final judgment" because immunity is lost if a case erroneously goes to trial); *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 339 U.S. 949 (1950) (holding that without the protection of qualified immunity, the risks and uncertainty of litigation could dissuade public servants from doing their duty). These immunities are meant to insulate law-abiding public servants against the harm of litigation *itself*, and therefore the ability to challenge the wrongful denial of qualified and discretionary-act immunity defenses in an appeal from the final judgment after trial does not constitute a plain, speedy, or adequate remedy at law. Thus, we elect to entertain this petition.

*Stuart is entitled to qualified immunity from Eggleston's constitutional claims*

Stuart argues that she is entitled to summary judgment on Eggleston's substantive and procedural due process claims under the doctrine of qualified immunity. "When reviewing an order granting or denying summary judgment in the context of a writ petition, we must also be cognizant of the summary judgment standard," and we review the order de novo. *State, Dep't of Transp. v. Eighth Jud. Dist. Ct.*, 133 Nev. 549, 553, 402 P.3d 677, 682 (2017). Summary judgment is proper if, considering the pleadings and all other evidence in the record, no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. *See Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Granting summary judgment on qualified immunity grounds is appropriate where the defendant's conduct did not violate any clearly established constitutional law. *See White v. Pauly*, 580 U.S. 73, 78-79 (2017) (quoting

Supreme Court
of
Nevada

(O) 1947A

7

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *see also Butler*, 123 Nev. at 458, 168 P.3d at 1061. Whether the defendant violated clearly established law is a question of law that we review de novo, despite the necessary review of the factual allegations. *Forsyth*, 472 U.S. at 528-29 & n.9; *see also Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2011) ("Whether specific facts constitute a violation of established law is a legal determination reviewed de novo.").

We conduct a two-step analysis based on the Supreme Court's holding in *Saucier v. Katz*, 533 U.S. 194 (2001), to decide the qualified immunity question: (1) whether the defendant's conduct violated a constitutional right, considering the evidence in the light most favorable to the plaintiff, and (2) whether, at the time of the defendant's conduct, said constitutional right was clearly established in the law. *Butler*, 123 Nev. at 458-59, 168 P.3d at 1061-62 (citing *Saucier*, 533 U.S. 194). We may address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Thus, an official's conduct loses the protections of qualified immunity when, at the time of the conduct at issue, the scope of the right is so clearly established that any reasonable official would recognize a violation. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This is an exacting standard, requiring that every reasonable official would understand that then-existing precedent forbids the defendant's conduct in the specific circumstances where it occurred. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). This does not require a plaintiff to show that the exact conduct at issue has been found unlawful in a case that is perfectly on point, but the unlawfulness of the defendant's conduct must be obvious given the understanding of the law at the time. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017). Courts must be

careful not to define the law at issue at a high level of generality and should focus their analysis on whether the specific facts alleged show a violation of clearly established law. *See Mullenix*, 577 U.S. at 12.

Eggleston's § 1983 claim alleges that Stuart violated his Fourteenth Amendment liberty interest in parenting his children, without due process of law. In rejecting Stuart's qualified immunity defense as to that claim, the district court cited three issues with Stuart's conduct that, if substantiated by a jury, would constitute a violation of clearly established law: (1) Stuart concealed aspects of her investigation from Eggleston; (2) Stuart misrepresented that she had authority to offer Eggleston in-home support services and rent assistance; and (3) Stuart coerced Eggleston's consent by misrepresenting that he was only consenting to a temporary guardianship, whereas now Eggleston has not seen his children for years. In his opposition to Stuart's motion for summary judgment, Eggleston proffered each of these contentions as supporting points for his overall § 1983 claim that his liberty interest in parenting his children was violated by the act of removing the children from the home. Eggleston's answer to the writ petition did not distinguish between these contentions, instead alleging generally that Stuart's conduct in the removal violated his parental liberty interest. We nevertheless address the issues under the two-prong qualified immunity framework.

*Stuart's alleged conduct did not violate a clearly established substantive due process right*

A parent's liberty interest in living with and raising their children is beyond dispute. *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Hardwick*, 844 F.3d at 1116. Indeed, earlier in the proceedings, we recognized that Eggleston's complaint raised a substantive due process issue regarding the fundamental right to parent his children.

*See Eggleston v. Stuart*, 137 Nev. 506, 511, 495 P.3d 482, 489 (2021) (*Eggleston I*). Eggleston alleges that this right was violated by Stuart's conduct in obtaining his consent to a temporary guardianship and that he has not seen his children since the guardianship began. Because we view the second step of the *Saucier* test as dispositive in this case, we focus our analysis on whether, at the time of Stuart's conduct, the law clearly established that this conduct was a violation of Eggleston's constitutional rights.[2]

In general, the appropriate standard for evaluating the alleged violation of familial rights is whether the conduct at issue "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). However, we are cognizant of the need to define rights at an appropriately specific level of generality for the purposes of qualified immunity. *See Mullenix*, 577 U.S. at 12. The conduct at issue here was that Stuart gave Eggleston two options for the care of the children: he could either consent to a temporary guardianship with the Callahans, or DFS would place the children into protective custody and then petition a court to remove the

---

[2]Our holding in *Eggleston I*—that Eggleston had sufficiently alleged a violation of his constitutional due process rights—was strictly under the motion to dismiss standard, where the allegations of the complaint are taken as true. *See Eggleston I*, 137 Nev. at 512, 495 P.3d at 489-90 ("*Taking Eggleston's allegations as true, as we must in the context of a motion to dismiss*, the state's actions 'shock the conscience . . . .'" (emphasis added)). Today, we evaluate Eggleston's claims with the benefit of the evidence produced in discovery under the stricter summary judgment standard. *See Wood*, 121 Nev. at 729, 121 P.3d at 1029. Additionally, in *Eggleston I*, we addressed whether Eggleston was required to exhaust his administrative remedies before bringing his claims and whether he had alleged procedural or substantive due process injuries, not the immunity defenses we now consider. *See Eggleston I*, 137 Nev. at 507, 510-13, 515, 495 P.3d at 486, 488-90, 491-92.

SUPREME COURT
OF
NEVADA

(O) 1947A

10

children from the home and place them in foster care. Eggleston consented to the temporary guardianship option, but he now argues that his consent was coerced. Thus, defined according to the specific circumstances in which these events occurred, the liberty interest at issue is Eggleston's right to determine his children's care, and the alleged violation is coercion of his consent.

We note at the outset that courts have generally found that placing children in temporary guardianships does not implicate a substantive due process violation. *See Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 170 (3d Cir. 2016) ("[T]he [Supreme] Court has never found a substantive due process violation when state agencies temporarily remove a child, whatever the circumstances of the removal."). The Second Circuit has drawn a distinction between temporary measures like a temporary guardianship and more severe measures like termination of parental rights, holding that the former do not implicate a "serious constitutional question" due to their temporary nature. *See Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003) (holding that temporary "ex parte removal" to keep children safe during an investigation did not violate substantive due process rights because there was no permanent termination of parental rights).

We have not squarely addressed the scope of parental due process rights in the context of consenting to a temporary guardianship offered by social services where coercion is alleged. But we have previously held that there is no substantive due process violation of parental rights where a district court awarded a temporary guardianship for a hospital to provide treatment to a child that the parents had refused to consent to. *See In re Guardianship of L.S. & H.S.*, 120 Nev. 157, 167, 87 P.3d 521, 527

(2004) (holding that a temporary guardianship struck a proper balance between parental substantive due process rights and the state's and child's interest in the child's well-being). Additionally, NRS 432B.340(1)(a) authorizes child welfare agencies to inform parents of a child in need of protection that the agency can petition a court for removal authority if they do not consent to a plan for services. Pursuant to NRS 432B.490, child welfare agencies have authority to petition a court for removal after an investigation shows a need for protection.

Other courts have held that it is not unconstitutionally coercive for a social worker to offer parents a choice between a supervisory plan short of full removal and full removal, so long as statutory authority supports removal. In *Dupuy v. Samuels*, 465 F.3d 757 (2006), the Seventh Circuit held that the practice of offering parents a choice between (1) consenting to "safety plan" restrictions during abuse investigations or (2) removal pursuant to statutory authority did not violate parental due process rights so long as the threat of removal is supported by adequate grounds. *Id.* at 760-63 ("It is not a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal rights. . . . Coercion is objectionable—and when objectionable is more aptly described as duress or extortion—when illegal means are used to obtain a benefit.").

Similarly, in *Sangraal v. City and County of San Francisco*, No. C 11–04884 LB, 2013 WL 3187384 (N.D. Cal. June 21, 2013), a social worker secured parental consent to a 48-hour movement restriction so that she could investigate allegations of misconduct against the father. *Id.* at *3. This agreement included the understanding that police would be called to take custody of the parents' daughter if the parents left before 48 hours had passed. *Id.* The parents alleged that their consent was unconstitutionally

coerced. *Id.* at *9. The court identified the key issue as "whether it was clearly established that the 48-hour 'hold' . . . interfered with [the parents'] familial relations, given the abuse allegations and the behavior [the social worker] observed." The federal district court disagreed that any coercion was unconstitutional, citing *Dupuy* and reasoning that, because there was "strong evidence" to support a reasonable belief of imminent harm to the daughter, the threat of police custody was not a clearly established violation of the parents' constitutional rights sufficient to defeat a qualified immunity defense. *Id.* at *11. This reasoning accords well with the Supreme Court's holding that, generally, consent must not be coerced. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).

Still, other courts have noted that statutory authority to support a threat of removal is only one factor in considering whether consent to a temporary removal was coerced. *See Morales v. County of Mendocino*, 16-CV-02429-EMC, 2018 WL 11257426, at *6-7 (N.D. Cal. Feb. 5, 2018) (conducting a totality-of-the-circumstances analysis to determine whether consent for temporary removal was coerced and considering statutory authority along with grandmother's familiarity with CPS procedures and her demeanor during the confrontation). Considering these cases, the qualified immunity analysis inquiry here is whether, given the statutory requirements for removal and the facts known to Stuart at the time, any reasonable social worker would recognize that threatening to petition for removal would violate Eggleston's constitutional rights.

Eggleston has not met the exacting "clearly established" standard required to defeat qualified immunity on this point. Eggleston cites cases showing that qualified immunity has been denied when social workers removed a child with neither a warrant nor a reasonable belief in

imminent harm. *See Mabe*, 237 F.3d at 1108-09 (denying summary judgment on qualified immunity ground where social worker's delay of four days between interview with alleged victim of child abuse and removal of said victim indicated no reasonable belief in imminent threat); *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1295-96 (9th Cir. 2007) (finding that officials' decision to delay obtaining medical care for children indicated that there was not a reasonable belief in imminent threat to the children sufficient to justify warrantless removal); *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1126-27 (3d Cir. 1997) (holding that a single anonymous report of sexual abuse was insufficient to support belief in imminent threat where subsequent interviews with parents did not substantiate the report).[3] Looking to other caselaw on the issue beyond what Eggleston has cited in briefing, courts have considered other factors such as an imminent lack of adequate care for children and the knowledge level of a family member who consents to a temporary removal. *See Ansara v. Maldonado*, 647 F. Supp. 3d 958, 973-74 (D. Nev. 2022) (imminent threat of harm justified social worker's warrantless removal from a daycare program because child would soon be transferred from the capable caregivers at the daycare to parent with known substance abuse issues); *Morales*, 2018 WL 11257426, at *6-7 (finding no coercion where consenting

---

[3]Eggleston also cites to two other cases that are substantively inapposite. *See Garver v. Washoe County*, No. 3:09–CV–00463–LRH–WGC, 2011 WL 6002969 (D. Nev. Nov. 28, 2011) (denying qualified immunity at summary judgment stage because genuine issues of material fact remained regarding what information was conveyed to social workers who ordered removal by police but were not at the scene); *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101 (9th Cir. 2010) (affirming denial of qualified immunity at summary judgment stage in case where foster license was revoked).

grandmother was familiar with CPS procedures from previous employment and voluntarily consented after discussion with social worker).

Taken together, the facts do not indicate that any reasonable social worker would recognize that stating that DFS would remove the children into protective custody would violate Eggleston's constitutional rights, given the circumstances present in this case and the state of the law at the time. Stuart's investigation indicated that Rodriguez had ongoing struggles with substance abuse and serious mental health issues, that the children had faced serious risks to their well-being while left in Rodriguez's sole care, and that Eggleston's long work hours meant he was often unavailable to protect them or care for their needs. Stuart was also aware that Eggleston and Rodriguez planned to separate and that Rodriguez would be pursuing in-patient rehabilitation for her addiction problems, meaning that the demands of caring for the children would soon fall on Eggleston alone, despite his long work hours. Stuart knew from communication with her supervisors and coworkers that the support resources and rental assistance needed for the in-home safety plan were no longer available. After the DFS meeting, she also knew that her supervisors recommended removal to foster care, suggesting that she had statutory authority to petition for removal pursuant to NRS 432B.340 and NRS 432B.490. Significantly, despite Eggleston's allegations that he was threatened with never seeing his children again, *Eggleston I*, 137 Nev. at 514, 495 P.3d at 491, the record has not borne out that this was actually the case. During the discussion where Stuart offered Eggleston the choice between DFS placing the children into protective custody and petitioning a court for removal, or signing the temporary guardianship papers, Stuart allowed Eggleston to call his lawyer and even spoke to Eggleston's attorney

herself. Thus, at the time Eggleston agreed to the temporary guardianship, Eggleston had obtained legal advice, and it appeared to Stuart that Eggleston understood his options.

These facts distinguish Stuart's situation from the caselaw cited by Eggleston. Stuart had more familiarity with the threats facing the children than the social workers in *Sangraal* and *Croft*, given her investigation and communication with Eggleston. She knew that there would soon be no reliable caretaker for the children, given that relatives who had been providing care would be leaving, Rodriguez would be leaving for rehabilitation, and Eggleston's demanding work schedule meant he would be unable to consistently care for the children himself, a situation similar to that in *Ansara*. She did not delay and leave H.E. and R.E. in this dangerous situation, unlike the social workers in *Mabe* and *Rogers*. Similar to the grandmother who had worked at CPS in *Morales*, Eggleston was able to draw on his knowledge to make a more informed decision as to his options and discussed those options with Stuart. Given the foregoing, we conclude that Eggleston cannot show that on January 7, 2015, a reasonable social worker would know that Stuart's offer of temporary guardianship in lieu of removal to foster care was coercive or otherwise unconstitutional. Therefore, he cannot show that there was a violation of his clearly established parental rights. We hold that Stuart is entitled to qualified immunity on his substantive due process claims.

We are sensitive to Eggleston's assertions that he has not seen his children in the years since he signed the guardianship. However, we cannot ignore that an official's conduct is outside the protection of qualified immunity only if it is clearly established as unconstitutional *at the time of the conduct. See, e.g., Pearson*, 555 U.S. at 227 ("[P]etitioners are entitled

to qualified immunity on the ground that it was not clearly established at the time of the search that their conduct was unconstitutional."). When Eggleston gave his consent, he and Stuart ostensibly believed that the temporary guardianship would be temporary, and we must assess Stuart's conduct in light of the guardianship's intended temporariness. Moreover, a § 1983 claim challenges *government* action, and the fact that the Callahans have not sent H.E. and R.E. back to Nevada does not change the fact that Stuart secured Eggleston's consent only for a temporary guardianship. *See* 42 U.S.C. § 1983.

*Stuart's alleged conduct did not violate a clearly established procedural due process right*

Eggleston also alleged a violation of his procedural due process rights. He claimed that because Stuart and DFS did not keep him fully informed of various developments in their investigation, he did not have adequate notice or opportunity to respond to the investigation and the choice between removal or a temporary guardianship. In particular, he alleges that he was unable to effectively respond to the investigation because Stuart did not tell him that *he* was being investigated for abuse and neglect, as well as Rodriguez, and because Stuart misrepresented her ability to connect him with the in-home services and other benefits under the safety plan. Eggleston argues that his cooperation with Stuart was premised on the idea of the safety plan as an option and that he was thus unable to effectively respond when it was suddenly withdrawn. Overall, Eggleston alleges that Stuart used an "ambush strategy" when she confronted him with his options, therefore depriving him of meaningful notice and opportunity to respond to her.

Stuart asserts that she is entitled to qualified immunity on these claims because Eggleston has not alleged a constitutional violation on

 

these facts. She emphasizes that although procedural due process requirements are well-documented for proceedings such as termination of parental rights, there is no clearly established law showing procedural due process violations occur when less severe measures are taken, such as the temporary guardianship in this case. She also argues that there exists no statutory or constitutional right to receive benefits or to be notified of investigations or the possibility of DFS seeking removal.

As to Eggleston's contentions that he was not kept informed of the DFS investigation's details and the withdrawal of safety plan benefits, he has failed to establish that any constitutional violation occurred. Eggleston has provided caselaw establishing the procedural due process requirements in other areas of the law, but he has not pointed to any authority showing a right to be completely informed of a DFS investigation or of the availability of benefits. *See Santosky v. Kramer*, 455 U.S. 745, 758 (1982) (discussing procedural due process requirements for termination of parental rights proceedings); *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31-32 (1981) (same); *Eureka County v. Seventh Jud. Dist. Ct.*, 134 Nev. 275, 276, 417 P.3d 1123, 1125 (2018) (addressing due process requirements for a show-cause hearing to determine water rights); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (discussing due process rights for U.S. citizens imprisoned as enemy combatants). These cases do not establish that Eggleston had any procedural due process right to be informed of the details of the DFS investigation or to be apprised of whether the benefits and the safety plan were still available. Therefore, these claims do not overcome the first prong of *Saucier*'s two-prong test, and Stuart is entitled to qualified immunity on these claims.

Eggleston's claim that he was unable to effectively respond to the choices that Stuart offered him on January 7 because of an "ambush strategy" find more support in the caselaw he has provided, but there are important distinguishing features. *Santosky* and *Lassiter* both addressed parental rights termination proceedings, whereas Eggleston consented only to a temporary guardianship. Thus, there is some doubt as to whether these cases establish procedural due process rights in temporary guardianships at an appropriate level of generality. However, even if we were to hold that they do, and that Stuart's conduct violated those rights, that law was certainly not clearly established at the time of the conduct sufficient to meet the exacting standards of the second step in the *Saucier* framework. *See Costanich*, 627 F.3d at 1108 (holding that a social worker was entitled to qualified immunity on a due process claim where her conduct violated the Due Process Clause, but at the time the law was not sufficiently clear as to the specific proceeding at issue for the violation to be clearly established). Therefore, we hold that Stuart is also entitled to qualified immunity on Eggleston's alleged "ambush" procedural due process claim.

*Stuart is entitled to discretionary-act immunity from Eggleston's tort claim*

Stuart also argues that she is entitled to discretionary-act immunity from Eggleston's IIED claim. We agree. "[T]o fall within the scope of discretionary-act immunity, a decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 123 Nev. 433, 446-47, 168 P.3d 720, 729 (2007) (adopting the *Berkovitz-Gaubert* test that the United States Supreme Court established for federal discretionary-act immunity). As to the first criterion, we have clarified that discretionary-act immunity does not apply to intentional torts or bad-faith conduct, as such acts are outside of a public official's discretion. *Franchise Tax Bd. of Cal. v.*

Supreme Court
OF
Nevada

(O) 1947A

19

*Hyatt*, 130 Nev. 662, 682, 335 P.3d 125, 139 (2014), *vacated on other grounds*, 578 U.S. 171 (2016). As to the second criterion, we have held that "if the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion." *Martinez*, 123 Nev. at 446, 168 P.3d at 729.

The district court denied discretionary-act immunity on the grounds that Stuart's actions did not conclusively satisfy the requirements for discretionary-act immunity, because if a jury found that Stuart had coerced Eggleston, her actions would have exceeded her discretion and would not have fallen within the considerations of social policy.

Whether discretionary-act immunity applies to a particular official's actions presents a mixed question of law and fact. *Martinez*, 123 Nev. at 438-39, 168 P.3d 724. We review a district court's conclusions of law de novo. *Id.*

As to the first inquiry, Stuart's actions involved elements of individual judgment or choice. Stuart testified during her deposition that (1) she was the person who presented Eggleston with the choice between DFS placing the children into protective custody and petitioning a court for removal or Eggleston signing a temporary guardianship, (2) she called police to assist, and (3) she conferred with her DFS colleagues to ensure that her actions were appropriate. Although the decision to either seek to remove the children to foster care or place them in a temporary guardianship may not have been Stuart's alone, the first part of the *Martinez* test only requires "an element of individual judgment or choice."

123 Nev. at 446-47, 168 P.3d at 729. Stuart had to make individual judgments as to the safety of the children if left at Eggleston's home, the propriety of the alternatives (temporary guardianship or removal), and whether police officers would be necessary to ensure the safety of all involved. These judgments reflect an element of individual judgment or choice.

Furthermore, her actions do not reflect bad faith or an intentional tort. Eggleston has not presented evidence of bad faith on Stuart's part. Considering the previous abuse and neglect investigations by CPS, and the decision from her DFS colleagues and supervisors, Stuart had a reasonable, good-faith belief that she was operating under statutory authority when she presented Eggleston with his options based on NRS 432B.340 and 432B.490.

Stuart's actions were also based on policy considerations sufficient to satisfy the second part of the test. "The focus of the second criterion's inquiry is not on the employee's 'subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Martinez*, 123 Nev. at 445, 168 P.3d at 728 (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)). The state has an interest in the welfare of children, and in acting upon that interest, the state generally must do so with the goal of securing the child's best interests. Stuart's actions in this case are susceptible to this policy analysis because offering placement options to parents facing a potential termination of parental rights implicate the best interests of the children, a mainstay of family law policy. *See, e.g., Manuela H. v. Eighth Jud. Dist. Ct.*, 132 Nev. 1, 7, 365 P.3d 497, 501-02 (2016) (discussing the legislature's interest in protecting best

interests of children when enacting statutes governing petitions for removal from parental custody); *In re Parental Rights as to D.R.H.*, 120 Nev. 422, 427, 92 P.3d 1230, 1233-34 (2004) (discussing the state's compelling interest in protecting the best interests of children in parental rights termination proceedings). Stuart's actions in investigating Eggleston and in obtaining his consent to a temporary guardianship clearly implicate Nevada's policy of supporting the best interests of children, and allowing the claims against her to proceed could negatively impact how that policy is carried out in the future.

Lastly, immunizing Stuart from suit promotes Nevada's "compelling interest in assuring that abused and neglected children achieve safe, stable and permanent home environments within which to be reared." *Id.* at 427, 92 P.3d at 1233. The determination that it is in children's best interests to separate them from their parents will always be in fundamental tension with parental rights. Discretionary-act immunity is necessary for social workers to do the painstaking work of navigating that tension competently and lawfully. Here, Stuart acted to protect the children from Eggleston's failure to adequately supervise and care for them in the face of Rodriguez's struggles with addiction and mental health. Accordingly, we hold that Stuart is entitled to discretionary-act immunity on Eggleston's IIED claim.

## CONCLUSION

Qualified and discretionary-act immunities protect government employees from suit when performing their jobs unless they do so in a way that violates a clearly established right or is conducted in bad faith. These immunities present special legal issues that must be decided before trial, lest they be lost forever. Stuart's actions did not violate any of Eggleston's clearly established rights but rather reflected her lawful exercise of

discretion as a public servant. Accordingly, we grant the petition and direct the clerk of this court to issue a writ of mandamus ordering the district court to vacate the challenged order denying summary judgment and enter an order granting summary judgment on the § 1983 claims and the IIED claims in favor of Stuart and Clark County. In light of this opinion, we lift the stay of proceedings imposed by our March 18, 2024, order.

_____, C.J.
Herndon

We concur:

_____, J.
Pickering

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Cadish

_____, J.
Lee

BELL, J., dissenting:

I respectfully dissent for two reasons. First, granting Stuart's petition contradicts our decision in *Eggleston v. Stuart*, 137 Nev. 506, 495 P.3d 482 (2021) (hereinafter *Eggleston I*). Second, I disagree with the majority's conclusion that Stuart was simply acting pursuant to her authority under NRS Chapter 432B. Evidence could support a conclusion that Stuart circumvented the carefully structured statutory process to protect neglected children by coercing Eggleston into signing a guardianship, thereby disposing of the need to have any further involvement with the Eggleston children. If Stuart used coercion or threats to achieve her aims, she would not be entitled to qualified or discretionary act immunity.

*Granting Stuart immunity conflicts with our decision in* Eggleston I

This case last came before us after the district court granted in part Stuart's motion to dismiss. *Id.* at 506-07, 495 P.3d at 486. Two pieces of our analysis are relevant here. First, we concluded Eggleston was not required to exhaust administrative remedies because he asserted a substantive, rather than a procedural, due process claim. *Id.* at 513, 495 P.3d at 490. We took Eggleston's allegations as true "that Clark County and Stuart arbitrarily and capriciously . . . forced him under duress to sign temporary guardianship papers leading to the unwarranted removal of his children from his care." *Id.* at 511-12, 495 P.3d at 489. We concluded this was enough to "shock the conscience," giving rise to a substantive due process claim. *Id.* at 512, 495 P.3d at 489-90. Discovery has not eliminated factual disputes about whether Stuart's threat was arbitrary and capricious. Stuart's coercive tactics still "shock the conscience," and conduct shocking to the conscience is not protected by qualified immunity. *See*

*Tobias v. Arteaga*, 996 F.3d 571, 575 (9th Cir. 2021); *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478-79 (7th Cir. 2011).

Second, we concluded the district court erred in *Eggleston I* by disallowing punitive damages. *Eggleston I*, 137 Nev. at 514, 495 P.3d at 491. We stated punitive damages were allowed because the allegations in the complaint indicated Stuart was acting in an individual capacity, outside the scope of her official authority. *Id.* Specifically, we stated that Eggleston sufficiently alleged Stuart acted beyond the scope of her authority when she "arrived at his home with two police officers and forced him to sign temporary guardianship papers under the threat that he would otherwise never see his children again." *Id.* Discovery has borne out Eggleston's allegations, and I see no reason we should reverse course and now declare that Stuart's actions were within the scope of her authority. Because Stuart was acting in her individual capacity, she should not be entitled to qualified or discretionary act immunity.

*Stuart's threat circumvented the statutory procedures for removal*

Stuart's coercive tactics also sidestepped important procedural protections, both for Eggleston and the children. Absent Stuart's on-the-spot ultimatum, Eggleston could have made an informed choice to work toward getting his children back through a normal protective custody proceeding, affording him a panoply of procedural protections. *See* NRS 432B.470(1) (providing notice and a hearing within 72 hours of removal to determine whether protective custody is required); NRS 432B.540(2) (requiring DFS to submit a plan for placement of the children during an investigation); NRS 432B.540(2)(b) (requiring DFS to submit a plan to reunite the parents and children); NRS 432B.393(1) (requiring DFS to "make reasonable efforts to preserve and reunify the family of a child").

By coercing Eggleston into agreeing to the temporary guardianship, Stuart avoided her responsibilities to appropriately place the children, ensure the children's continuing welfare, and make efforts to reunify Eggleston with his children. Meanwhile, Eggleston lost access to resources that would assist him with reunification and the opportunity to contest any of DFS's actions in court. Using a threat to circumvent important protections for children and parents violated Eggleston's clearly established right to custody and control of his children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (explaining that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents"). This holds especially true if Stuart could not actually have taken the children on the spot, and Eggleston has offered evidence the children were not in immediate danger when Stuart made her threat. Thus, I believe there is a triable question of fact as to whether Stuart violated Eggleston's clearly established due process rights. Social workers are responsible for some of the most vulnerable people in our society, but that does not entitle Stuart to use threats or coercion to achieve those ends, and I dissent.

_____, J.

Bell